## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

CASE NO. _____

| | |
|---|---|
| INNOVATIVE EMERGENCY MANAGEMENT, INC., a Louisiana corporation, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| ABML, LLC, a Florida limited liability company, | ) ) ) |
| Defendant. | ) ) ) |

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff, INNOVATIVE EMERGENCY MANAGEMENT, INC. ("*Plaintiff*" or "*IEM*"), by and through its undersigned counsel, Duane Morris LLP, sues Defendant, ABML, LLC ("*Defendant*" or "*ABML*"), a Florida limited liability company, and in support thereof, alleges:

## NATURE OF THE CASE

1.      This is an action for injunctive relief stemming from ABML's unauthorized, unilateral distribution of $29,225,845.88 to itself in a brazen attempt to raid the coffers of the parties' joint venture while simultaneously depriving IEM of its contractual distribution rights.

## PARTIES, JURISDICTION, & VENUE

2.      IEM is a Louisiana corporation with its principal place of business located at 2801 Slater Road, Suite 200, Morrisville, North Carolina, 27560-8477.

3.      ABML is a Florida limited liability corporation with its principal place of business located at 565 East Hillsboro Boulevard, Deerfield Beach, Florida, 33441-3543. ABML was

formally known and did business in Florida as ABML, Inc. Pursuant to the Articles of Conversion filed with the Florida Secretary of State Division of Corporations, ABML, Inc. converted into ABML on March 15, 2021.

4.     Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction as the amount in controversy exceeds of $75,000.01 and, upon information and belief, no member of ABML is a citizen of Louisiana or North Carolina.

5.     Specifically, IEM is informed and believes that ABML's membership is comprised of the following individuals: Brittany Perkins Castillo, Randy Perkins, and Gerardo Castillo, all of whom are known to be citizens of Florida or, with respect to Brittany Perkins Castillo and Gerardo Castillo, possibly citizens of Utah.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (b).

7.     IEM has complied with all conditions precedent and is entitled to initiate, maintain, and prosecute this litigation or such conditions precedent have occurred or have been waived or otherwise excused.

8.     IEM has agreed to pay its undersigned counsel attorney's fees and costs for prosecuting this action on its behalf.

## GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

### The Parties' Business Relationship

9.     IEM and ABML are companies involved in the disaster management industry. Both perform services nationwide and contract with private and public clients, including state governments, to perform a variety of emergency and disaster management services.

10.     IEM and ABML entered into a joint venture whereby they joined forces to provide various COVID-19 healthcare support operations throughout the United States, including, but not limited to, monoclonal antibody therapy and vaccination support services.

11.     The joint venture was memorialized by the formation of a Florida limited liability company, ABML-IEM, LLC (the "***LLC***"), which is not a party to this action, with IEM and ABML each holding a 50% membership interest in the LLC.

### Operation, Management, and Control of the LLC

12.     The Limited Liability Company Agreement (the "***LLC Agreement***"), attached hereto as **Exhibit A**, dated January 21, 2021, memorializes the parties' joint venture, and sets forth the parties' agreement as to the operation, management, and control of the LLC.

13.     Pursuant to the LLC Agreement, the business and affairs of the LLC are to be managed, operated, and controlled by a Board of Managers (the "***Board***").  **Exhibit A**, ¶6.1.

14.     The Board is comprised of three managers designated by ABML (*i.e.*, Brittany Perkins Castillo, Randy Perkins, and Gerardo Castillo) and two managers designated by IEM (*i.e.*, Madhu Beriwal and Bryan Koon).  *Id*. at ¶6.2.  Ray Mueller replaced Madhu Beriwal on the Board in May 2021.

15.     Due to the composition of the Board, and because each designated manager has a single vote, ABML is the controlling member of the LLC.

### Management and Control of LLC Funds

16.     With respect to the management and control of LLC funds, the LLC Agreement provides as follows:

> Company Funds. All funds of the Company shall be deposited in its name, or in such name as may be designated by the Board, in such checking, savings, or other accounts, or held in its name in the form of such other investments as shall be designated by the Board. The funds of the Company shall not be commingled with

the funds of any other Person. All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of such Officer or Officers as the Board may designate.

*Id*. at ¶11.6.

17.     The LLC Agreement also provides for the distribution of LLC funds and states, in pertinent part, the following:

Any available cash of the Company, after allowance for payment of all Company obligations then due and payable, including debt service, operating expenses, and such other reasonable reserves as the Board may determine, ***shall be distributed to the Members, on at least an annual basis, pro rata in accordance with their Percentage Interests***.

*See* **Exhibit A**, ¶5.1.1. (emphasis added).

18.     During the course of the LLC's operations, ABML, as the controlling member of the LLC, caused the LLC to establish deposit account(s) at ABML's preferred bank with ABML's regular banker and with no dual-signature requirement on any transaction of any size.

19.     IEM never consented to this structure although it did provide Ms. Beriwal's personal information to the bank to assist in opening accounts in the belief that IEM would also have signature authority on the LLC's deposit account(s).

20.     On or about April 28, 2021, ABML and IEM agreed to certain internal financial controls requiring dual approvals of all checks, regardless of size; however, ABML refused to agree to any bank-level financial controls of any kind. *See* Letter from IEM to ABML dated May 5, 2021 attached hereto as **Exhibit B**.

21.     Specifically, IEM requested a bank-level financial control in the form of a dual signature requirement on individual disbursements from the LLC's accounts in excess of $100,000.

22.     IEM further requested that ABML commit to limiting the amount of disbursements that are not (1) pre-approved under the negotiated internal financial controls; (2) authorized by dual signature; and/or (3) reconciled and accepted by IEM to a maximum of $1,000,000.

23.     ABML refused IEM's proposed bank-level financial controls and has never expressed any explanation for its refusal.

### ABML's History of Abusing Its Control of LLC Funds

24.     During the course of the LLC's operations, ABML has a demonstrated history of abusing its control of LLC funds by attempting to make unilateral distributions without IEM's approval in violation of the parties' agreed upon financial controls as well as the LLC Agreement.

25.     On May 6, 2021, IEM was informed—on an hours' notice—of disbursements ABML's financial team decided to make from the LLC account(s), with no request for IEM's approval.  *See* Letter from IEM to ABML dated May 13, 2021 attached hereto as **Exhibit C**.

26.     IEM took issue with ABML's threatened unilateral distribution and informed ABML that it viewed such actions as being contrary both to the parties' agreed upon financial controls the terms of the LLC Agreement.  *Id.*

27.     ABML, in turn, acknowledged that IEM's approval was required to make distributions from the LLC's bank accounts and assured IEM that "No payments of LLC funds have been made by ABML without the express approval of IEM" and that "the agreed upon controls and process were followed, and obviously work. They will continue to be followed throughout the course of the venture." *See* Letter from ABML to IEM dated May 11, 2021 attached hereto as **Exhibit D**.

28.     Based upon ABML's assurances that it would refrain from abusing its control of LLC funds, and that it would adhere to the LLC Agreement, IEM ultimately acceded to ABML's

continued control of the LLC's finances at that time. *See* Letter from IEM to ABML dated November 8, 2022 attached hereto as **Exhibit E**, at pg. 1.

### Winding Down the LLC's Business and Distribution Amounts

29.     Given the conclusion of the COVID-19 pandemic, IEM and ABML preliminarily started the process of winding down the LLC's business.

30.     This process included, *inter alia*, determining the amount of the distributions owed to each party.

31.     IEM's CFO and ABML's Director of Finance and Accounting worked to resolve questions concerning the allocation of expenses to the LLC as opposed to the individual members themselves and calculated the total to distribute and each party's share. *See* Letter from ABML to IEM dated November 9, 2022 attached hereto as **Exhibit F**, at pg. 2.

32.     This calculation was for a total distribution amount of $58,451,691.76 and a *pro rata* amount of $29,225,845.88 for each party, but this was subject to final, joint approval of ABML and IEM.  *Id*.

33.     However, this joint approval never occurred.

### ABML's Unauthorized, Unilateral Distribution of LLC Funds

34.     Contrary to the distribution provision in the LLC Agreement as well as its previous assurances to obtain IEM's approval prior to distributing LLC funds, on or about September 30, 2022, ABML made a unilateral distribution of LLC funds to itself in the amount of $29,225,845.88 without IEM's approval.

35.     ABML made this distribution only to itself despite the LLC Agreement expressly requiring that any distributions to the LLC's members be made "*pro rata* in accordance with their Percentage Interests"—in this case, an even 50/50 split.  **Exhibit A**, ¶¶3.1 and 5.1.1.

36.     IEM did not learn of ABML's unauthorized and unilateral distribution to itself until on or about November 7, 2022.

37.     On November 8, 2022, IEM demanded to receive its *pro rata* distribution in accordance with the LLC Agreement.

38.     ABML, however, refused to deliver IEM's *pro rata* distribution and, instead, demanded that IEM provide it with a financial accounting for the work IEM performed in Illinois and Louisiana that ABML believes should have been performed by the LLC.

39.     This unrelated dispute was raised by ABML in May 2021, and IEM understood it to be resolved shortly thereafter.  Now, some 18 months later, ABML purports to use this unrelated dispute as an excuse for making a unilateral distribution.

40.     ABML further threatened to reduce IEM *pro rata* distribution unilaterally if IEM did not comply with its demand for a financial accounting by the end of the fiscal year. **Exhibit F**, pg. 3.

41.     Nothing in the LLC Agreement allows ABML to take a unilateral distribution of LLC funds without IEM's approval or to hold IEM's distribution rights hostage to its extraneous demand.

42.     ABML's dispute with IEM about its demand for a financial accounting for work performed in Illinois and Louisiana is unrelated to and has no bearing on the parties' entitlement to *pro rata* distributions under the terms of the LLC Agreement.

43.     To resolve its separate dispute with IEM, ABML was required to adhere to the dispute resolution procedures set forth in the LLC Agreement, which require the parties to participate in non-binding mediation and, if that effort fails, to submit the dispute to binding arbitration.  **Exhibit A**, Article 13.

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

44.     The dispute resolution provisions in the LLC Agreement state, in pertinent part, as follows:

> Board Dispute. If the Board disagrees regarding any issue that materially and adversely affects the Company (a "Dispute"), then the Managers shall consult and negotiate with each other in good faith to find an agreeable solution. If the Managers do not reach a solution within seven days from the date the disagreement occurred, then the Board shall provide notice to the Members (a "Dispute Notice").

> Consideration by Member Executives. Within three days after the giving of the Dispute Notice, the Dispute shall be referred by the Board to the senior executive of each Member (each, a "Member Executive") in an attempt to reach resolution. Meetings of the Member Executives may be held either in person or by telephone or video conference or other communication device that permits all Member Executives participating in the meeting to hear each other. If the Member Executives are unable to resolve the Business Dispute within 14 days after the date of the Dispute Notice, or such longer period as they may agree in writing, then the mediation provisions herein shall apply.

> * * *

> Nonbinding Mediation. Prior to binding arbitration, the Members shall endeavor to settle Disputes by nonbinding mediation before a neutral Person . . . A demand for mediation shall be made within a reasonable time after the Dispute has arisen. . . .

> * * *

> Binding Arbitration. If the Dispute remains unresolved at the conclusion of the mediation process, a Member may submit the dispute for resolution by final binding confidential arbitration. A demand for arbitration shall be made within a reasonable time after the claim, dispute, or other matter in question has arisen. . . .

**Exhibit A**, ¶¶13.1-13.5.

45.     Even though ABML had raised the issue of IEM's work in Illinois and Louisiana in May 2021, at no time since then did ABML follow the dispute resolution provisions set forth in the LLC Agreement.

46.     ABML wrongly believes that it has the unilateral right to deprive IEM of its rights under the LLC Agreement while it takes whatever money from LLC it wishes whenever it wishes, without IEM's approval, without justification, and without any agreement by IEM.

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

47.     ABML's actions are in direct violation of the distribution provision in the LLC Agreement, have severely undermined the parties' joint venture, and were designed to irreparably harm IEM by depriving it of its bargained-for distribution rights under the LLC Agreement.

48.     Because ABML has control over the LLC's finances and is the controlling member of the LLC, IEM has no way to prevent ABML from making similar unauthorized, unilateral distributions to itself in the future or, even worse, depleting the LLC's finances altogether.

**The LLC Agreement Contemplates Equitable Relief in the Event of a Breach**

49.     The parties agreed that they would be entitled to seek equitable relief in the event of a breach by the other party.

50.     Paragraph 13.7 of the LLC Agreement reflects the parties' understanding with respect to seeking equitable relief, and it states as follows:

> Equitable Remedies. Each Member acknowledges that a breach or threatened breach by such Member of any of its obligations hereunder would give rise to irreparable harm to the other Members, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such Member of any such obligations, each of the other Members hereto shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

**Exhibit A**, ¶13.7.

51.     Because ABML's separate dispute with IEM must be submitted to non-binding mediation and, if that fails, to binding arbitration, and because ABML breached the LLC Agreement by making an unauthorized, unilateral distribution of LLC funds to itself without IEM's approval, IEM is entitled to seek injunctive relief to protect the present and continued deprivation of IEM's distribution rights under the LLC Agreement.

**DUANE MORRIS LLP**
201 South Biscayne Boulevard · Suite 3400 · Miami · Florida 33131 ·Tel: 305.960.2200

52.     Given ABML's failure to adhere to the parties' agreed-upon dispute resolution procedure, IEM provided ABML with a formal notice of dispute and demand for non-binding mediation pursuant to Article 13 of the LLC Agreement on November 8, 2022.  **Exhibit E**, pg. 2.

53.     To date, the Board has failed to take action with respect to IEM's dispute notice and demand for non-binding mediation.

## <u>COUNT I</u>

### Breach of Contract

54.     IEM re-alleges and incorporates paragraphs 1 through 53 of this Complaint as though they are fully set forth herein.

55.     At all material times hereto, there existed a valid contract (*i.e.*, the LLC Agreement) between IEM, on the one hand, and ABML on the other hand. The terms of the LLC Agreement are incorporated herein by reference.

56.     The LLC Agreement is supported by consideration, as acknowledged by the parties thereto.

57.     With respect to distributions, the LLC Agreement contains the following provision:

> Any available cash of the Company, after allowance for payment of all Company obligations then due and payable, including debt service, operating expenses, and such other reasonable reserves ***as the Board may determine, shall be distributed to the Members, on at least an annual basis, pro rata in accordance with their Percentage Interests***.

*See* **Exhibit A**, ¶5.1.1. (emphasis added).

58.     The LLC Agreement includes valid and fully enforceable provisions, including the distribution provision quoted above.

59.     ABML materially breached the LLC Agreement by, among other things, violating the distribution provision set forth in Paragraph 5.1.1 by making an unauthorized, unilateral

distribution of $29,225,845.88 to itself without IEM's approval, without justification, and while depriving IEM of its distribution rights under the LLC Agreement.

60.     As a direct and proximate result of ABML's breach of the LLC Agreement, IEM has suffered and continues to suffer harm and irreparable injury.

61.     Specifically, ABML's breach of the LLC Agreement has deprived IEM of its bargained-for right to a *pro rata* distribution under the LLC Agreement.

62.     Unless ABML is enjoined from continuing to breach the LLC Agreement in such a manner, IEM will suffer further immediate, irreparable injury.

63.     IEM lacks an adequate remedy at law to prevent ABML from continuing to breach the LLC Agreement and depriving IEM of its rights thereunder.

64.     Because ABML has control over the LLC's finances and is the controlling member of the LLC, IEM has no way to prevent ABML from making similar unauthorized, unilateral distributions to itself in the future or, even worse, depleting the LLC's finances altogether.

65.     IEM has a substantial likelihood of success on the merits of this claim, and injunctive relief would serve the public interest regarding the protection and enforcement of contractual rights.

WHEREFORE, IEM respectfully requests the Court enter a judgment in its favor and against ABML and, specifically:

   I.     Grant preliminary and permanent injunctive relief enjoining ABML from continuing to breach the LLC Agreement.

   II.    Order that ABML pay $29,225,845.88 into the Court Registry to be held until the parties resolve their dispute in non-binding mediation or binding arbitration; or in

the alternative, order ABML to immediately pay IEM its *pro rata* distribution in the amount of $29,225,845.88.

III.    Order that ABML certify the monetary balance of the LLC's bank account(s) and further order ABML to refrain from making any withdrawals or distributions of monies from the LLC bank account(s) without prior written approval of IEM.

IV.    Grant any such further relief as the Court deems necessary and just.

Dated this 21st day of November, 2022.                    Respectfully Submitted,

/s/ Kevin E. Vance
Kevin E. Vance
Florida Bar No. 0670464
**DUANE MORRIS LLP**
1875 NW Corporate Boulevard
Suite 300
Boca Raton, Florida 33431-8561
Tel: (561) 962-2100
kevance@duanemorris.com
pnmendoza@duanemorris.com
mlchapski@duanemorris.com

-and-

Julian A. Jackson-Fannin, Esq.
Florida Bar No.: 93220
**DUANE MORRIS LLP**
201 S. Biscayne Boulevard, Suite 3400
Miami, Florida 33131
Telephone:  (305) 960-2253
jjfannin@duanemorris.com
pnmendoza@duanemorris.com
jmagarin@duanemorris.com

## VERIFICATION

I declare, under penalty of perjury under the laws of the United States of America, that the factual allegations in the foregoing Verified Complaint for Injunctive Relief are true and correct. 28 U.S.C. § 1746.

Signature: _____

Name: _____
As Authorized Representative for
Plaintiff, INNOVATIVE
EMERGENCY MANAGEMENT,
INC.

Date: _____

DM1\13624508.1

# Exhibit A

## LIMITED LIABILITY COMPANY AGREEMENT

THIS LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") is entered into on January 21, 2021 between:

ABML, INC. ("ABML"), a Florida corporation with a place of business at 565 East Hillsboro Boulevard, Deerfield Beach, Florida, 33441-3543; and

INNOVATIVE EMERGENCY MANAGEMENT, INC. ("IEM"), a Louisiana corporation with a place of business at 2801 Slater Road, Suite 200, Morrisville, North Carolina, 27560-8477.

### Recitals

WHEREAS, the Members desire to establish "ABML–IEM, LLC" as a Florida limited liability company (the "Company") for the exclusive purpose of  monoclonal antibody therapy, alternate care, vaccination support, and hospital support with wrap-around services and medical staff, supplies, and equipment to the extent possible under the laws, rules, and regulations of the jurisdiction where the services are performed and, in all cases, specifically in support of COVID-19 healthcare support operations throughout the United States (collectively, the "Business"); and

WHEREAS, the Members wish to enter into this Agreement setting forth the terms governing the operation and management of the Company.

NOW, THEREFORE, in recognition of the foregoing recitals, and in consideration of the promises and covenants contained herein, and in exchange for other good and valuable consideration, the receipt and sufficiency of all of which is acknowledged, the Members agree as follows:

### Article 1. Organization

1.1     Organization. The Members organize the Company as a Florida limited liability company pursuant to the Florida Revised Limited Liability Company Act (the "Act"). Prior to the Company conducting business in any other jurisdiction, the Board shall cause the Company to comply with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction if the Board determines that such qualification is necessary or advisable.

1.2     Applicability of the Act. This Agreement shall constitute the "operating agreement" (as that term is used in the Act) of the Company. It is the express intention of the Members that except as expressly prohibited or ineffective under the Act, this Agreement shall govern, even when inconsistent with, or different than, the Act or any Law. To the extent any provision hereof is prohibited or ineffective under the Act, this Agreement shall be considered amended to the least extent possible to make this Agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a manner to make valid any provision hereof that was formerly invalid, such provision shall be considered to be valid from the effective date of such interpretation or amendment. The Members agree that each Member shall be entitled to rely on the provisions hereof, and no Member shall be liable to the Company or to any other Member for any action or refusal to act made in good faith reliance on the terms hereof. The Members and the Company agree that the duties and obligations imposed on the Members shall be those set forth herein, which is intended to govern the relationship among the Members, notwithstanding any provision of the Act or Law to the contrary.

1.3     Name. The name of the Company shall be "ABML–IEM, LLC" and all business of the Company shall be conducted under that name or under any name by unanimous consent of the Members to the extent permitted by Law.

1.4     Principal Office. The principal office of the Company shall be located at 565 East Hillsboro Boulevard, Deerfield Beach, Florida, 33441-3543, or such other place as may from time to time be determined by unanimous consent of the Members.

BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

1.5    Registered Agent and Office. The registered agent for service of process and the address for the registered office of the Company shall be Michael W. Moskowitz, 800 Corporate Drive, Suite 500, Fort Lauderdale, Florida, 33334. The Board, may, from time to time, change the registered agent or office of the Company through appropriate filings with the Florida Secretary of State. In the event the registered agent ceases to act as registered agent, or the registered office shall change, the Board shall promptly designate a replacement registered agent or file a change of address notice. The Board shall be entitled to register the Company to transact business in any other jurisdiction as may be necessary or desirable, and to appoint registered agents to serve on behalf of the Company in such jurisdictions.

1.6    Purpose; Powers. The Company has been formed, organized, and created for the exclusive purpose of the Business and for no other purpose, unless approved by unanimous written consent of the Members. The Company shall have all powers necessary or convenient to engage in all lawful activities necessary, customary, convenient, or incident to accomplish the purpose of the Business. The Company shall establish and maintain such operating policies and procedures as are necessary or desirable for the effective conduct of the Company's business.

1.7    Term. The term of the Company ("Term") shall commence on the date the Certificate of Authority ("Certificate") is filed with the Florida Secretary of State and shall continue in existence until the Company is dissolved in accordance with the provisions hereof and the Act.

1.8    No Partnership Intended for Non-tax Purposes. The Members have formed the Company under the Act and do not intend to form a partnership (including a limited partnership) under any Law for any purposes other than as set forth in Section 11.3. The Members do not intend to be partners one to another, or partners as to any Person. To the extent any Member, by word or action, represents to another Person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation.

## Article 2. Capital Contributions and Capital Accounts

2.1    Initial Capital Contributions. Each Member shall make an initial capital contribution of cash (each, an "Initial Capital Contribution") and will own a Membership Interest in the proportion set forth opposite such Member's name in Section 3.1. No Member shall have the right to withdraw or be paid or repaid for their Initial Capital Contribution except as otherwise provided herein. Each Initial Capital Contribution shall be made at the cost and expense of the contributing Member. Each Initial Capital Contribution shall be in proportion to the Membership Interests described in Section 3.1. The Members shall modify this Agreement upon the Transfer of any Membership Interest to any new or existing Member in accordance herewith, or as otherwise required by the terms hereof.

2.2    Additional Capital Contributions.

2.2.1.    The Members shall make additional Capital Contributions, in proportion to their Percentage Interests, as determined by the Board from time to time to be reasonably necessary for the Company to fulfill its obligations fully and promptly (each, an "Additional Capital Contribution"). If the Additional Capital Contribution shall not be funded in cash, the amount of such Additional Capital Contribution shall be the Book Value of such assets. Upon the Board making such determination to call for Additional Capital Contributions, the Board shall notify the Members of the Company's need for Additional Capital Contributions, which shall specify in reasonable detail: (a) the purpose for such Additional Capital Contributions; (b) the aggregate amount of such Additional Capital Contributions; (c) each Member's pro rata share of such aggregate amount of Additional Capital Contributions (based upon such Member's Percentage Interest); and (d) the date on which such Additional Capital Contributions shall be required to be made by the Members.

    BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

2.2.2.  If any Member shall fail to timely make, or notifies the other Members that it shall not make, all or any portion of any Additional Capital Contribution which such Member is obligated to make under Section 2.2.1, then such Member will be deemed to be a "Noncontributing Member." A Member that is not in default of its obligations under Section 2.2.1 (a "Contributing Member") shall be entitled, but not obligated, to loan to the Noncontributing Member, by contributing to the Company on its behalf, all or any part of the amount (the "Default Amount") that the Noncontributing Member failed to contribute to the Company (each such loan, a "Default Loan"), provided that such Contributing Member shall have contributed to the Company its pro rata share of the Additional Capital Contribution. The proceeds of such Default Loan shall be treated as an Additional Capital Contribution by the Noncontributing Member. Each Default Loan shall bear interest (compounded monthly on the first day of each calendar month) on the unpaid principal amount thereof from time to time remaining from the date advanced until repaid, at the lesser of: (a) 8% per annum; and (b) the maximum rate permitted by Law (the "Default Rate") and shall be recourse debt of the Noncontributing Member. Until such time as all Default Loans made to a Noncontributing Member have been repaid to the Contributing Member by such Noncontributing Member, (y) distributions payable to the Noncontributing Member pursuant hereto shall be paid to the Contributing Member as and to the extent provided in Section 5.1.2; and (z) any such amounts paid to the Contributing Member shall not be treated as a payment of any principal or interest on any Default Loan. So long as a Default Loan is outstanding, the Noncontributing Member shall have the right to repay it (plus interest then due and owing) in whole or in part. Upon its repayment in full of a Default Loan made to such Noncontributing Member, such Noncontributing Member shall (so long as it does not have any other outstanding Default Loans and is not otherwise a Noncontributing Member with respect to any other Additional Capital Contributions) cease to be a Noncontributing Member. Notwithstanding anything herein to the contrary, a Contributing Member may in its discretion demand payment of any outstanding Default Loan at any time by notifying the Noncontributing Member, at which time such Default Loan and any accrued and unpaid interest thereon shall be immediately due and payable to the Contributing Member.

2.2.3.  Any Default Amount that is not funded pursuant to a Default Loan shall bear interest at the Default Rate (compounded monthly on the first day of each calendar month) from the date such Additional Capital Contribution was due until paid in full to the Company by the Noncontributing Member. Upon repayment in full of any such Default Amount, plus interest thereon, such Noncontributing Member shall (so long as it does not have any outstanding Default Loans and is not otherwise a Noncontributing Member with respect to any other Additional Capital Contributions) cease to be a Noncontributing Member and will be a Contributing Member.

2.2.4.  Notwithstanding the foregoing, if a Noncontributing Member has an unpaid Additional Capital Contribution that has not been funded pursuant to a Default Loan, without limitation of any other rights or remedies that may be available, a Contributing Member may: (a) institute proceedings against the Noncontributing Member, either in the Contributing Member's own name or on behalf of the Company, to obtain payment of such unpaid Additional Capital Contribution, plus interest thereon at the Default Rate from the date that such Additional Capital Contribution was due until the date that such Additional Capital Contribution is made, at the cost and expense of the Noncontributing Member; or (b) purchase the

                                              BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

Membership Interest of the Noncontributing Member at a price equal to the Fair Market Value of the Noncontributing Member's Membership Interest.

2.2.5.   Each Member acknowledges and agrees that it would be impracticable or extremely difficult to determine the damages incurred by a Contributing Member as a result of a failure of a Member to fund its portion of an Additional Capital Contribution, and that the entitlement of a Contributing Member to exercise the remedies described in this Section 2.2 is fair and reasonable.

2.2.6.   Except as set forth in this Section 2.2 or in Section 2.5, neither Member shall be required to make additional Capital Contributions or make loans to the Company.

2.2.7.   No Person shall use Capital Contributions for non-Company business.

2.3   <u>Maintenance of Capital Accounts.</u> The Company shall establish and maintain for each Member a separate capital account (a "Capital Account") on its records in accordance with this Section 2.3. Each Capital Account shall be established and maintained in accordance with the following:

2.3.1.   Each Member's Capital Account shall be increased by the amount of: (a) such Member's Capital Contributions, including such Member's Initial Capital Contribution and any Additional Capital Contributions; (b) any Net Income or other item of income or gain allocated to such Member pursuant to Article 4 hereof; and (c) any liabilities of the Company that are assumed by such Member or secured by any property distributed to such Member.

2.3.2.   Each Member's Capital Account shall be decreased by: (a) the cash amount or Book Value of any property distributed to such Member pursuant to Article 5 and Section 12.3.3; (b) the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to Article 4 hereof; and (c) the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

2.4   <u>Succession Upon Transfer.</u> In the event that any Membership Interest is Transferred in accordance with the terms hereof, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Membership Interest and, subject to Section 4.4, shall receive allocations and distributions pursuant to Article 4, Article 5, and Article 12 hereof in respect of such Membership Interest.

2.5   <u>Negative Capital Accounts.</u> In the event that any Member shall have a deficit balance in its Capital Account, such Member shall have no obligation to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by Law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention hereof.

2.6   <u>No Withdrawals from Capital Accounts.</u> No Member shall be entitled to withdraw any part of its Capital Account or to receive any distribution from the Company, except as otherwise provided herein. No Member shall receive any interest, salary, management, or service fees, or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided herein. The Capital Accounts are maintained for the purpose of allocating items of income, gain, loss, and deduction among the Members and shall have no effect on the amount of any distributions to any Members, in liquidation or otherwise.

2.7   <u>Loans from Members.</u> Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account, other than to the extent provided in Section 2.3.1.

BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

2.8    Modifications. The provisions hereof relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations §1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Board determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Board may authorize such modifications.

### Article 3. Members

3.1    Members. The names of the Members, as well as their Membership Interests and Initial Capital Contributions are:

| Member | Membership Interest | Initial Capital Contribution |
|---|---|---|
| ABML, Inc. | 50% | $500.00 |
| Innovative Emergency Management, Inc. | 50% | $500.00 |

3.2    Admission of New Members.

3.2.1.    New Members may be admitted from time to time in connection with a Transfer of Membership Interests in accordance herewith, subject to compliance with Article 9 and Section 3.2.2.

3.2.2.    For any Person not already a Member of the Company to be admitted as a Member, the Members must unanimously consent to the admission, and such Person shall have executed and delivered to the Company a written joinder agreement. Upon the satisfaction of any other conditions reasonably necessary or desirable by the other Members to give effect to such admission, such Person shall be admitted as a Member and listed as such on the records of the Company. The Board shall adjust the Capital Accounts of the Members as necessary in accordance with Section 2.4.

The joinder agreement shall be substantially in the following form:

REFERENCE IS HEREBY MADE TO THE LIMITED LIABILITY COMPANY AGREEMENT, DATED JANUARY 12, 2021, AS AMENDED FROM TIME TO TIME (THE "LLC AGREEMENT"), BETWEEN ABML, INC. AND INNOVATIVE EMERGENCY MANAGEMENT, INC. FORMING ABML–IEM, LLC, A COMPANY ORGANIZED UNDER THE LAWS OF THE STATE OF FLORIDA. PURSUANT TO AND IN ACCORDANCE WITH SECTION 3.2.2 OF THE LLC AGREEMENT, THE UNDERSIGNED HEREBY ACKNOWLEDGES THAT IT HAS RECEIVED AND REVIEWED A COMPLETE COPY OF THE LLC AGREEMENT AND AGREES THAT UPON EXECUTION OF THIS JOINDER, SUCH PERSON SHALL BECOME A PARTY TO THE LLC AGREEMENT AND SHALL BE FULLY BOUND BY, AND SUBJECT TO, ALL OF THE TERMS OF THE LLC AGREEMENT AS THOUGH AN ORIGINAL PARTY THERETO AND WILL BE DEEMED, AND IS HEREBY ADMITTED AS, A MEMBER FOR ALL PURPOSES THEREOF AND ENTITLED TO ALL THE RIGHTS INCIDENTAL THERETO.

3.2.3.    Any Member who proposes to Transfer its Membership Interest (or any portion thereof) shall: (a) be responsible for the payment of expenses incurred by it in connection with such Transfer, whether or not consummated; and (b) except in connection with a Transfer pursuant to Section 2.2.4 reimburse the Company and the other Members for all reasonable expenses (including reasonable legal fees and expenses) incurred by or on behalf of the Company or such other Members in connection with such proposed Transfer, whether or not consummated.

LIMITED LIABILITY COMPANY AGREEMENT

3.3     <u>No Personal Liability.</u> Except as otherwise provided in the Act, by Law, or expressly herein, no Member shall be obligated personally for any debt, obligation, or liability of the Company or other Members, whether arising in contract, tort or otherwise, solely by reason of being a Member.

3.4     <u>No Withdrawal.</u> So long as a Member continues to hold any Membership Interest, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be void *ab initio*. As soon as any Person who is a Member ceases to hold any Membership Interests, such Person shall no longer be a Member. A Member shall not cease to be a Member because of the Bankruptcy of such Member or because of any other events specified in the Act.

3.5     <u>No Interest in Company Property.</u> No property of the Company will be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested in, the Company. Each Member hereby irrevocably waives any right that such Member may have to maintain any action for partition with respect to the property of the Company.

3.6     <u>Certification of Membership Interests.</u>

        3.6.1.   Upon request of a Member, the Board shall issue a certificate to such Member representing its Membership Interest.

        3.6.2.   If the Board issues certificates representing Membership Interests, then all certificates representing issued and outstanding Membership Interests shall bear all legends required by Law and a legend substantially in the following form:

                THE MEMBERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION, OR OTHER DISPOSITION OF THE MEMBERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH SUCH LIMITED LIABILITY COMPANY AGREEMENT.

                THE MEMBERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER ANY OTHER SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED, OR OTHERWISE DISPOSED EXCEPT PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS, OR AN EXEMPTION FROM REGISTRATION THEREUNDER.

### Article 4. Allocations

4.1     <u>Allocation of Net Income and Net Loss.</u> For each Fiscal Year (or portion thereof), after giving effect to the special allocations set forth in Section 4.2, Net Income and Net Loss of the Company shall be allocated among the Members pro rata in accordance with their Membership Interests.

4.2     <u>Regulatory and Special Allocations.</u> Notwithstanding Section 4.1:

        4.2.1.   If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations § 1.704-2(d)(1)) during any Fiscal Year, each Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations §

LIMITED LIABILITY COMPANY AGREEMENT

1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulations §§ 1.704-2(f)(6) and 1.704-2(j)(2). This Section 4.2.1 is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations § 1.704-2(f) and shall be interpreted consistently therewith.

4.2.2.  Member Nonrecourse Deductions shall be allocated in the manner required by Treasury Regulations § 1.704-2(i). Except as otherwise provided in Treasury Regulations § 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of such Member Nonrecourse Debt Minimum Gain shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain. Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations §§ 1.704-2(i)(4) and 1.704-2(j)(2). This Section 4.2.2 is intended to comply with the "minimum gain chargeback" requirements in Treasury Regulations § 1.704-2(i)(4) and shall be interpreted consistently therewith.

4.2.3.  Nonrecourse Deductions shall be allocated to the Members in accordance with their Membership Interests.

4.2.4.  In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations § 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income shall be specially allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations or distributions as quickly as possible. This Section 4.2.4 is intended to comply with the qualified income offset requirement in Treasury Regulations § 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

4.2.5.  The allocations set forth in Sections 4.2.1, 4.2.2, 4.2.3, 4.2.4 (the "Regulatory Allocations") are intended to comply with requirements of the Treasury Regulations under Code § 704. Notwithstanding any other provisions of this Article 4 (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

4.3  <u>Tax Allocations.</u>

4.3.1.  Subject to Sections 4.3.2, 4.3.3, and 4.3.4, all income, gains, losses and deductions of the Company shall be allocated, for federal, state, and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses, and deductions pursuant to Sections 4.1 and 4.2, except that if any such allocation for tax purposes is not permitted by the Code or other Law, the Company's subsequent income, gains, losses, and deductions shall be allocated among the Members for tax purposes, to the extent permitted by the Code and other Law, so as to reflect as nearly as possible the allocation set forth in Sections 4.1 and 4.2.

4.3.2.  Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code § 704(c) and the traditional method with curative allocations of Treasury Regulations § 1.704-3(c), so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

                                                   BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

4.3.3.    If the Book Value of any Company asset is adjusted pursuant to Treasury Regulations § 1.704-1(b)(2)(iv)(f), subsequent allocations of items of taxable income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code § 704(c).

4.3.4.    Allocations of tax credit, tax credit recapture, and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Board, taking into account the principles of Treasury Regulations § 1.704-1(b)(4)(ii).

4.3.5.    Allocations pursuant to this Section 4.3 are for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, distributions, or other items pursuant to any provisions hereof.

4.4    Allocations in Respect of Transferred Membership Interests. In the event of a Transfer of a Membership Interest during any Fiscal Year made in compliance with Article 9, Net Income, Net Losses and other items of income, gain, loss, and deduction of the Company attributable to such Membership Interest for such Fiscal Year shall be determined using the interim closing method.

## Article 5. Distributions

5.1    General.

5.1.1.    Any available cash of the Company, after allowance for payment of all Company obligations then due and payable, including debt service, operating expenses, and such other reasonable reserves as the Board may determine, shall be distributed to the Members, on at least an annual basis, pro rata in accordance with their Percentage Interests.

5.1.2.    Notwithstanding anything herein to the contrary: (a) if a Member has an outstanding Default Loan due to another Member, any amount that otherwise would be distributed to such Member pursuant to Sections 5.1 or 5.2, or Article 12 shall not be paid to such Member but will be deemed distributed to such Member and paid on behalf of such Member to the other Member that funded such Default Loan in accordance with Section 2.2.2; and (b) if a Member has an unpaid Additional Capital Contribution that has not been funded pursuant to a Default Loan, any amount that otherwise would be distributed to such Member pursuant to Sections 5.1 or 5.2, or Article 12 (up to the amount of such unpaid Additional Capital Contribution, and accrued interest thereon in accordance with Section 3.2.3) shall not be paid to such Member but will be deemed distributed to such Member and repaid to the Company (which payment shall first be applied to pay any accrued interest on such Additional Capital Contribution and thereafter to reduce the amount of the unpaid Additional Capital Contribution).

5.1.3.    Notwithstanding any provision hereof, the Company shall not make any distribution to the Members if such distribution would violate the Act or other Law or if such distribution is prohibited by the Company's debt-financing agreements.

5.2    Tax Distributions.

5.2.1.    Subject to Sections 5.1.2 and 5.1.3, at least seven days before each date prescribed by the Code for a calendar-year corporation to pay quarterly installments of estimated tax, the Company shall use commercially reasonable efforts to distribute cash to each Member in proportion to and to the extent of such Member's Quarterly

LIMITED LIABILITY COMPANY AGREEMENT

Estimated Tax Amount for the calendar quarter (each such distribution, a "Tax Distribution").

5.2.2.   If, at any time after the final Quarterly Estimated Tax Amount has been distributed pursuant to Section 5.2.1 with respect to any Fiscal Year, the aggregate Tax Distributions to any Member with respect to such Fiscal Year are less than such Member's Tax Amount for such Fiscal Year (a "Shortfall Amount"), the Company shall use commercially reasonable efforts to distribute cash in proportion to and to the extent of such Member's Shortfall Amount. The Company shall use commercially reasonable efforts to distribute Shortfall Amounts with respect to a Fiscal Year before the 75th day of the next succeeding Fiscal Year; provided, that if the Company has made distributions in such next succeeding Fiscal Year other than pursuant to this Section 5.2.2, the Board may apply such distributions to reduce any Shortfall Amount.

5.2.3.   If the aggregate Tax Distributions made to any Member pursuant to this Section 5.2 for any Fiscal Year exceed such Member's Tax Amount (an "Excess Amount"), such Excess Amount shall reduce subsequent Tax Distributions that would be made to such Member pursuant to this Section 5.2.

5.3   Tax Withholding; Withholding Advances.

5.3.1.   Each Member agrees to furnish the Company with any representations and forms as shall be reasonably requested by the Board to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have.

5.3.2.   The Company is hereby authorized at all times to make payments ("Withholding Advances") with respect to each Member in amounts required to discharge any obligation of the Company (as determined by the Board based on the advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority (a "Taxing Authority") with respect to any distribution or allocation by the Company of income or gain to such Member and to withhold the same from distributions to such Member. Any funds withheld from a distribution by reason of this Section 5.3.2 will be deemed distributed to the Member in question for all purposes hereunder.

5.3.3.   Any Withholding Advance made by the Company to a Taxing Authority on behalf of a Member and not simultaneously withheld from a distribution to that Member shall, with interest thereon accruing from the date of payment at a rate equal to the prime rate published in the Wall Street Journal on the date of payment plus 2% per annum (the "Company Interest Rate"): (a) be promptly repaid to the Company by the Member on whose behalf the Withholding Advance was made (which repayment by the Member shall not constitute a Capital Contribution, but shall credit the Member's Capital Account if the Board shall have initially charged the amount of the Withholding Advance to the Capital Account); or (b) with the consent of the Board (not including for purposes of such vote any Managers appointed by the Member on whose behalf the Withholding Advance has been made), be repaid by reducing the amount of the next succeeding distribution or distributions to be made to such Member (which reduction amount will be deemed to have been distributed to the Member, but which shall not further reduce the Member's Capital Account if the Board shall have initially charged the amount of the Withholding Advance to the Capital Account). Interest shall cease to accrue from the time the Member on whose behalf the Withholding Advance was made repays such Withholding Advance (and all accrued interest) by either method of repayment described above.

                    BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

5.3.4. Each Member hereby agrees to indemnify the Company and the other Members from and against any liability with respect to taxes, interest, or penalties that may be asserted by reason of the Company's failure to deduct and withhold tax on amounts distributable or allocable to such Member. This Section 5.3.4 and the obligations of a Member pursuant to Section 5.3.3 shall survive the termination, dissolution, liquidation, and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Membership Interest. The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 5.3, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

5.3.5. Neither the Company, nor any Manager shall be liable for any excess taxes withheld in respect of any distribution or allocation of income or gain to a Member. In the event of an over-withholding, a Member's recourse shall be to apply for a refund from the appropriate Taxing Authority.

5.4 Distributions in Kind. No Member has the right to demand or receive property other than cash in payment for its share of any distribution made in accordance herewith. Except as set out in Section 12.3.4, non-cash distributions are not permitted without the unanimous consent of the Members.

## Article 6. Management

6.1 Establishment of the Board. A board of managers of the Company (the "Board") is hereby established and shall be comprised of natural Persons (each such Person, a "Manager") who shall be appointed in accordance with Section 6.2. The business and affairs of the Company shall be managed, operated, and controlled by or under the direction of the Board, and the Board shall have, and is hereby granted, the full, complete, and exclusive power, authority, and discretion for, on behalf of and in the name of the Company, to take such actions as it may in its discretion determine to be necessary or advisable to carry out any and all of the objectives and purposes of the Company, subject to the terms hereof. No Manager, acting in his capacity as such, shall have any authority to bind the Company with respect to any matter except pursuant to a resolution authorizing such action that is adopted by unanimous consent of the Members. Except as expressly provided herein or by Law, no Member, in its capacity as a Member, shall have any power or authority over the business and affairs of the Company or any power or authority to act for or on behalf of, or to bind, the Company.

6.2 Board Composition. The Company and the Members shall take such actions as may be required to ensure that the number of Managers constituting the Board is always five. The Board shall be comprised as follows: (a) three individuals designated by ABML (each, an "ABML Manager"), who shall initially be Brittany Perkins Castillo, Randy Perkins, and Gerardo Castillo; and (b) two individuals designated by IEM (each, an "IEM Manager"), who shall initially be Madhu Beriwal and Bryan Koon.

6.3 Removal; Resignation; Vacancies.

6.3.1. Each Member may remove any Manager appointed by it at any time with or without cause, effective upon notice to the other Members and the Chairperson. No Manager may be removed except in accordance with this Section 6.3.1.

6.3.2. A Manager may resign at any time from the Board by delivering his written resignation to the Chairperson. Any such resignation shall be effective upon receipt thereof unless it is specified to be effective at another time or upon the occurrence of another event. The Board's or Company's acceptance of a resignation shall not be necessary to make it effective.

LIMITED LIABILITY COMPANY AGREEMENT

6.3.3. Any vacancy on the Board resulting from the resignation, removal, death, or disability of a Manager shall be filled by the same Member that appointed such Manager pursuant to Section 6.3.1, with such appointment to become effective immediately upon notifying the other Members and the Chairperson of such appointment.

6.3.4. The Board shall maintain a schedule of all Managers with their mailing addresses (the "Managers Schedule"), and shall update the Managers Schedule upon the appointment, removal or replacement of any Manager in accordance with Section 6.2 or this Section 6.3.

6.3.5. The Members shall take all necessary actions to carry out fully Section 6.2 and this Section 6.3 to ensure that the Board consists of the Managers that are appointed in accordance with such sections.

6.4 <u>Meetings.</u>

6.4.1. Regular meetings of the Board shall, unless otherwise agreed by the Board, be held on at least a quarterly basis on such dates and at such times as shall be determined by the Board. Special meetings of the Board may be called at any time at the written request of any Manager who makes such request in good faith. Meetings of the Board may be held either in person or by telephone or video conference or other communication device that permits all Managers participating in the meeting to hear each other.

6.4.2. The Chairperson shall provide notice of each regular meeting of the Board stating the place, date, and time of the meeting and a proposed agenda of the business to be transacted thereat, and any relevant supporting material sufficient to inform the Managers of such business, to each Manager by electronic mail or fax not less than 14 days before the date of such meeting; provided, however, that the business to be transacted at any regular meeting shall not be limited to the matters set forth on any agenda circulated prior to the meeting. Each Manager shall, not later than seven days following his receipt of such proposed agenda, notify the Chairperson of any additional agenda items that such Manager desires to be considered at the meeting, and any relevant supporting material sufficient to inform the other Managers of such additional matters. If any additional agenda items are provided to the Chairperson, he or she shall circulate an updated agenda incorporating such additional items to all Managers, and any relevant supporting material provided to the Chairperson, not later than three days prior to such regular meeting.

6.4.3. A Manager calling a special meeting shall provide notice of the special meeting of the Board stating the place, date, and time of the meeting and a proposed agenda of the business to be transacted thereat, and any relevant supporting material sufficient to inform the Managers of such business, to each Manager by electronic mail or fax not less than seven days before the date of such meeting; provided that, in the case of a special meeting, the Chairperson may reduce the advance notice period to not less than three days if he or she determines, acting reasonably and in good faith, that it is necessary and in the best interests of the Company for the Board to take action within a time period of less than seven days. Each Manager shall, not later than three days following his receipt of such proposed agenda, notify the Chairperson of any additional agenda items he or she desires to be considered at such meeting, and any relevant supporting material sufficient to inform the other Managers of such additional matters. If any additional agenda items are provided to him or her, the Chairperson shall circulate an updated agenda incorporating any such additional items to all Managers, and any relevant supporting material

 BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

provided to him or her, not later than one day before the date of such special meeting. The business to be transacted at any special meeting shall, unless otherwise agreed unanimously by the Managers present at such meeting, be limited to the matters set forth on the agenda last circulated prior to the meeting.

6.4.4.   Notice of any meeting may be waived in writing by any Manager. Presence at a meeting shall constitute waiver of any deficiency of notice under Sections 6.4.2 or 6.4.3, except when a Manager attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting was not called or convened in accordance herewith and does not otherwise attend the meeting.

6.4.5.   The decisions and resolutions of the Board shall be recorded in minutes prepared by the Chairperson (or such other Person as may be designated by the Board from time to time), which shall state the date, time, and place of the meeting (or the date of any written consent in lieu of a meeting), the Managers present at the meeting, the resolutions put to a vote (or the subject of a written consent) and the results of such voting or written consent. The Chairperson (or such other Person as may be designated by the Board) shall circulate a draft of the minutes of each meeting to the Managers within 14 days following the date of such meeting. All Managers shall have an opportunity to object to or submit clarifications to the minutes. The minutes shall be entered in a minute book kept at the principal office of the Company or such other location as determined by the Board.

6.5   Quorum; Manner of Acting.

6.5.1.   The presence of at least two ABML Managers and one IEM Manager shall constitute a quorum; provided, however, that if and for so long as a Member is a Defaulting Member, the presence of such Member's Managers shall not be required to achieve a quorum.

6.5.2.   Any Manager may participate in a meeting of the Board by telephone or video conference or other communications device that permits all Managers participating in the meeting to hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting. A Manager may vote or be present at a meeting either in person or by proxy in accordance with Section 6.5.4.

6.5.3.   Each Manager shall have one vote on all matters submitted to the Board; provided, however, that, notwithstanding anything herein to the contrary and without limitation of any other rights or remedies that may be available, if and for so long as one of the Members (but not all) is a Defaulting Member, all decisions of the Board shall be made by the Managers appointed by the Member that is not a Defaulting Member. Except as otherwise set forth herein, the affirmative vote of a majority of the Managers in attendance at any meeting of the Board at which a quorum is present shall be required to authorize any action by the Board and shall constitute the action of the Board for all purposes.

6.5.4.   Each Manager may authorize another individual (who may or may not be a Manager, but who shall be an officer or employee of the Member that appointed such Manager or an Affiliate of such Member) to act for such Manager by proxy at any meeting of the Board, or to express consent or dissent to a Company action in writing without a meeting. Any such proxy may be granted in writing, by Electronic Transmission or as otherwise permitted by Law.

6.6   Action by Written Consent. Any action of the Board may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed unanimously by all the

BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

Managers. Such consent shall have the same effect as a vote at a meeting where a quorum was present.

6.7     Authority to Bind. Except as otherwise provided herein, the signature of any Manager to whom the Members have delegated appropriate authority in writing constitutes execution of a document on behalf of the Company. A copy or extract hereof may be shown to any Person to confirm such authority. No Manager shall take any action not in the ordinary course of business of the Company unless otherwise authorized hereby with the prior approval of Members holding a majority of ownership interests in the Company. Except as otherwise provided herein, no Member shall act for, deal on behalf of, or bind the Company in any way other than through its representatives (acting as such) on the Board. Nothing herein may be construed as giving a Member the authority to exercise any form of control whatsoever over any other Member.

6.8     Compensation; No Employment.

        6.8.1.    Each Manager shall serve without compensation in his capacity as such. Each Manager shall be entitled to reimbursement from the Company for his reasonable and necessary out-of-pocket expenses incurred in the performance of his duties as a Manager, pursuant to such policies as may from time to time be established by unanimous consent of the Members.

        6.8.2.    This Agreement does not, and is not intended to, confer upon any Manager any rights with respect to employment by the Company, and nothing herein shall be construed to have created any employment agreement or relationship with any Manager.

6.9     Chairperson of the Board. A majority vote of the Board shall designate one Manager to serve as chairperson of the Board ("Chairperson"). The Chairperson shall preside at all meetings of the Board at which he or she is present, subject to the ultimate authority of the Board to appoint an alternate presiding chairperson at any meeting. A Manager shall not be considered to be an officer of the Company by virtue of holding the position of Chairperson and, except as expressly provided herein, shall not have any rights or powers different from any other Manager other than with respect to any procedural matters to the extent delegated by unanimous agreement of the Managers or as expressly set forth herein; provided, however, that any procedural rights or powers granted to the Chairperson shall not be in derogation of any rights or powers granted hereby to any Manager. The Chairperson may not cut off debate on any matter being considered by the Board and shall, at the request of a Manager, call for a vote on any item under consideration by the Board.

6.10    Officers. The Board may appoint individuals as officers of the Company (each, an "Officer") as necessary or desirable to carry on the business of the Company and the Board may delegate to such Officers powers and authorities as necessary. No Officer need be a Member or Manager. Any individual may hold two or more offices of the Company. Each Officer shall hold office until his successor is designated by the Board or until his earlier death, resignation, or removal. Any Officer may resign at any time by notifying the Board. The Board may remove any Officer with or without cause at any time. A vacancy in any office occurring because of death, resignation, removal, or otherwise, may, but need not, be filled by the Board. The Officers of the Company shall at all times include a President, a Vice President, a Secretary, and a Treasurer. The Members agree that they shall cause their representatives on the Board to vote such that at all times the Officers shall include a President as shall be designated by ABML, and a Vice President as shall be designated by IEM.

6.11    No Personal Liability. Except as otherwise provided in the Act or by Law, no Manager shall be obligated personally for any debt, obligation, or liability of the Company, whether arising in contract, tort or otherwise, by reason of being a Manager.

BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

6.12   Other Activities; Business Opportunities.

    6.12.1.   Except as set forth in Section 10.3, nothing contained herein shall prevent any Member or any of its Affiliates from engaging in any other activities or businesses, regardless of whether those activities or businesses are similar to the Business, provided that said activities or businesses do not compete with the Business. None of the Members nor any of their Affiliates shall be obligated to account to the Company or to the other Members for any profits or income earned or derived from other such activities or businesses. Except as otherwise provided in Section 6.12.2, none of the Members nor any of their Affiliates shall be obligated to inform the Company or the other Members of any business opportunity of any type or description.

    6.12.2.   Notwithstanding Section 6.12.1, if a Member or any Affiliate of a Member is offered or discovers a business opportunity of the type and character that is within the scope of the Business (a "Business Opportunity"), such Member shall, prior to it or its Affiliate pursuing such Business Opportunity, offer to the Company the right to pursue such Business Opportunity for the benefit of the Company, regardless of whether such Member believes the Company would be able (financially or otherwise) or willing to pursue such Business Opportunity. If the Board (not including for purposes of such vote the Managers appointed by the Member presenting the Business Opportunity to the Company), has not determined that the Company shall pursue such Business Opportunity within three days after its presentation to the Company, the presenting Member or its Affiliate shall, subject to compliance with Section 10.3, be free to pursue such Business Opportunity as such Member or Affiliate shall determine in its discretion.

6.13   Actions Requiring Approval of Members. Without the unanimous written approval of all Members, the Company shall not, and shall not enter any commitment to: (a) amend, modify or waive the Certificate or this Agreement; provided that the Board may, without the consent of the Members, amend the schedule of Members following any new issuance, redemption, repurchase, or Transfer of Membership Interests in accordance with this Agreement; (b) make any material change to the nature of the Business conducted by the Company or enter into any business other than the Business; (c) issue additional Membership Interests or admit additional Members to the Company; (d) incur any indebtedness, pledge or grant liens on any assets or guarantee, assume, endorse or otherwise become responsible for the obligations of any other Person; (e) make any investments in any other Person; (f) appoint or remove the Company's auditors or make any changes in the accounting methods or policies of the Company, other than as required by United States generally accepted accounting principles in effect from time to time ("GAAP"); (g) enter into, amend in any material respect, waive or terminate any Related-party Agreement other than the entry into a Related-party Agreement that is on an arm's length basis and on terms not less favorable to the Company than those that could be obtained from an unaffiliated Person; (h) enter into or effect any transaction or series of related transactions involving the purchase, lease, license, exchange, or other acquisition (including by merger, consolidation, acquisition of stock, or acquisition of assets) by the Company of any assets and/or equity interests of any Person; (i) enter into or effect any transaction or series of related transactions involving the sale, lease, license, exchange, or other disposition (including by merger, consolidation, sale of stock, or sale of assets) by the Company of any assets; (j) establish a subsidiary or enter into any joint venture or similar business arrangement; (k) settle any lawsuit, action, dispute, or other proceeding or otherwise assume any liability or agree to the provision of any equitable relief by the Company; (l) initiate or consummate an initial public offering or make a public offering and sale of the Membership Interests or any other securities; (m) admit any new Member of the Company or issue any

LIMITED LIABILITY COMPANY AGREEMENT

additional Membership Interests; (n) determine to pursue any new facility, project, or new line of work for the Business or cease the operation or pursuit of any facility, project, or line of work actively in use or in development; (o) exclude, change, or reduce the responsibility of any Member or its affiliates in connection with the Company's Business; or (p) dissolve, wind up, or liquidate the Company or initiate a bankruptcy proceeding involving the Company.

6.14   Engagement Lead. For each contract awarded to the Company, the Board shall appoint an Engagement Lead, who shall be responsible for the operational performance of the contract. Each Engagement Lead must be an employee of a Member. The Engagement Lead shall be the primary point of contact with the client and shall proactively resolve any issues and ensure client satisfaction. The Engagement Lead shall have the authority to make operational decisions to ensure the performance of the contract is satisfactory but shall seek approval from the Board prior to the expenditure of any funds by the Company.

6.15   Dealing with Clients. The Engagement Lead shall be the client's primary point of contact for the Company. Each Manager shall have the opportunity to participate in all presentations, discussions, conferences, and reviews with the client, except to the extent that time does not allow for the participation of each Manager or the communication with client would be inappropriate to include each Manager and, in those circumstances, debriefings of the presentations, discussions, conferences, or reviews will be undertaken at a reasonable time thereafter. Each Manager shall ensure the availability of management and technical personnel to participate, as necessary, in any discussions with the client. The Managers shall advise one another of any significant communications with the client related to the performance of the contract.

6.16   Operations. Assignment and reassignment of work and services between the Members shall be assigned in proportion to their Membership Interests to the maximum extent practicable. In accordance with this Section 6.16, the Board shall have responsibility and authority for the assignment and reassignment of work and services between the Members preparation of schedules for the completion of services, settlement of disputes with any contractor or contractors, the division of compensation in accordance herewith, and any other matters affecting the performance of services hereunder. In the event of a reassignment of services, the Board shall equitably reapportion distributions commensurate with the services reassigned. The Company shall not hire employees. The personnel necessary to perform the Contract shall be employees of Members or subcontractors of the Members.

6.17   Communications. All communications and transmittals between the Company and any Person shall be on letterhead, transmittal forms, or other forms or documents previously approved by the Board and bearing the name of the Company.

### Article 7. Insurance and Bonds

7.1   Company Insurance. The Company shall acquire and maintain, at its own cost, such policies of insurance as required. Such policies shall be primary, and each Member shall be granted a waiver of subrogation on all such policies and named as an additional insured on the policies.

7.2   Member Insurance. Each Member shall carry and maintain its own insurance coverage for itself and its employees. No Member shall be required to insure any other Member's interests or the Company or to insure any loss, liability, cost, or expense arising from the work or services of the other Members. Each Member agrees that it shall maintain any required insurance coverage. Each Member represents that the insurance it maintains in connection with the general conduct of its business covers that Member's interest in the Company.

7.3   Bonds and Financial Guarantees. No Member shall be required to provide a bond or financial guarantee or to otherwise furnish an indemnity or serve as guarantor in support of a bond or financial guarantee, except with its prior written consent.

                                        BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

### Article 8. Exculpation and Indemnification

8.1     Exculpation of Covered Persons.

    8.1.1.     No Covered Person shall be liable to the Company or any Covered Person for any loss, damage, or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in his capacity as a Covered Person, whether or not such Person continues to be a Covered Person at the time such loss, damage, or claim is incurred or imposed, so long as such action or omission does not constitute fraud, gross negligence, intentional misconduct, or a breach or violation by such Covered Person of any of such Covered Person's or his Affiliates' agreements contained herein or in any other agreements with the Company.

    8.1.2.     A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports, or statements (including financial statements and information, opinions, reports, or statements as to the value or amount of the assets, liabilities, Net Income, or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (a) a Manager; (b) one or more Officers or employees of the Company; (c) any attorney, independent accountant, appraiser, or other expert or professional employed or engaged by or on behalf of the Company; or (d) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in the Act.

8.2     Liabilities and Duties of Covered Persons.

    8.2.1.     This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Law, and in doing so, acknowledges and agrees that the duties and obligations of each Covered Person to each other and to the Company are only as expressly set forth herein. The provisions hereof, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

    8.2.2.     Whenever herein a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's discretion or under a grant of similar authority or latitude), such Covered Person such Covered Person's own interests (or, in the case of a Manager, the interests of the Member that appointed such Manager or such Member's Affiliates), the Company's interests, and interests of or factors affecting the Company or any other Person. Whenever herein a Covered Person is permitted or required to make a decision in such Covered Person's good faith, the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed hereby or any other Law.

8.3     Indemnification.

    8.3.1.     To the fullest extent permitted by the Act, as the same now exists or may hereafter be amended, substituted, or replaced (but, in the case of any such amendment, substitution, or replacement, only to the extent that such amendment, substitution, or replacement permits the Company to provide broader indemnification rights than the Act permitted the Company to provide prior to such amendment, substitution, or replacement), the Company shall indemnify, hold harmless, defend, pay, and

BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

reimburse any Covered Person from and against any and all losses, claims, damages, judgments, fines, or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines, or liabilities, and any amounts expended in settlement of any claims (other than in connection with any claims brought by a Member or its Affiliate against another Member or its Affiliate, or the Company) (collectively, "Losses") to which such Covered Person may become subject by reason of: (a) any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company in connection with the Business; or (b) such Covered Person being or acting in connection with the Business as a Member, an Affiliate of a Member, a Manager, or an Officer, or that such Covered Person is or was serving at the request of the Company as a member, manager, partner, director, officer, employee, or agent of any other Person; provided, that (y) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and within the scope of such Covered Person's authority conferred on him, her, or it by the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his, her, or its conduct was unlawful; and (z) such Covered Person's conduct did not constitute fraud, gross negligence, intentional misconduct, or a breach or violation by such Covered Person of any of such Covered Person's, or his, her, or its Affiliates', agreements contained herein or in any other agreements with the Company, in each case as determined by a final, non-appealable order of a court of competent jurisdiction. In connection with the foregoing, the termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud, gross negligence, intentional misconduct, or a breach or violation by such Covered Person of any of such Covered Person's, or his, her, or its Affiliates', agreements contained herein or in any other agreements with the Company.

8.3.2.    The indemnification provided by this Section 8.3 will not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. This Section 8.3 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 8.3 and shall benefit the executors, administrators, legatees, and distributees of such Covered Person.

8.3.3.    To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Board may determine; provided, that: (a) all Members and Managers shall be treated equally under any such insurance policies; and (b) the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

8.3.4.   Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 8.3 shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

8.3.5.   If this Section 8.3 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify each Covered Person pursuant to this Section 8.3 to the fullest extent permitted by any portion of this Section 8.3 that shall not have been invalidated and to the fullest extent permitted by Law.

8.3.6.   This Section 8.3 shall be a contract between the Company and each Covered Person who served in such capacity at any time while this Section 8.3 is in effect, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this Section 8.3 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification, or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

8.4   Survival. This Article 7 shall survive the dissolution, liquidation, winding up, and termination of the Company.

## Article 9. Transfer

9.1   Restrictions on Transfer.

9.1.1.   Except as otherwise provided in Sections 2.2.4 or 4.2.4 or this Article 9, no Member shall Transfer all or any portion of its Membership Interest without the written consent of the other Members. No Transfer of Membership Interests to a Person not already a Member of the Company will be deemed completed until the prospective Transferee is admitted as a Member of the Company in accordance with Section 3.2.2.

9.1.2.   Notwithstanding any other provision hereof, each Member agrees that it shall not Transfer all or any portion of its Membership Interest, and the Company agrees that it shall not issue any Membership Interests: (a) except as permitted under the Securities Act of 1933 and other federal or state securities or blue sky laws, and then, with respect to a Transfer of Membership Interests, only upon delivery to the Company of an opinion of counsel satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act of 1933; (b) if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Section 7704(b) of the Code within the meaning of Treasury Regulations § 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulations § 1.7704-1(h)(3); (c) if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the Act; (d) if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes; (e) if such Transfer or issuance would cause the Company to be required to register as an investment company under the Investment Company Act of 1940; (f) if such Transfer or issuance would cause the assets of the Company to be deemed "Plan Assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company; or (g) if such Transfer or issuance is in violation of the provisions of Section 6.13.

LIMITED LIABILITY COMPANY AGREEMENT

9.1.3.   Any Transfer or attempted Transfer of any Membership Interest in contravention hereof shall be void *ab initio*, no such Transfer shall be recorded on the Company's books or otherwise recognized by the Company, and the purported Transferee in any such Transfer shall not be treated as the owner of such Membership Interest for any purposes hereof or have any rights as a Member (and the purported Transferor shall continue to be treated as the owner of such Membership Interest and as a Member).

9.1.4.   Any Transfer of a Membership Interest permitted hereby will be deemed a sale, transfer, assignment, or other disposal of such Membership Interest in its entirety as intended by the parties to such Transfer, and will not be deemed a sale, transfer, assignment, or other disposal of any less than all of the rights and benefits described in the definition of the term Membership Interest, unless otherwise explicitly agreed to by the parties to such Transfer.

9.2   <u>Permitted Transfers.</u> Section 9.1 shall not apply to any Transfer by a Member that is not a Defaulting Member (a "Transferring Member") of all of its Membership Interest to an Affiliate of such Transferring Member that is wholly-owned by the ultimate parent of such Transferring Member; provided that: (a) such Transferring Member shall have guaranteed in a writing delivered to the Company and the other Members the performance by the Transferee of all of such Transferring Member's obligations hereunder; and (b) if at any time such Transferee ceases to be an Affiliate of such Transferring Member that is wholly-owned by the ultimate parent of such Transferring Member, the Company, such Transferring Member and such Transferee shall take such action as is necessary to cause there to be an immediate and unconditional reconveyance of the Membership Interest to either (in the discretion of such Transferring Member) such Transferring Member, the ultimate parent of such Transferring Member, or any wholly-owned Affiliate of such Transferring Member.

9.3   <u>Push-Pull Buy Sell.</u> Notwithstanding anything in this Article 9 to the contrary, in the event any Member (the "Initiating Member") notifies any other Member (the "Responding Member") in writing of his, her, or its offer to purchase all of the Membership Interests of the Responding Member, the Responding Member shall have 30 days from the receipt of such offer to deliver to the Initiating Member written notification of either: (a) such Responding Member's agreement to sell all of the Membership Interests of the Responding Member to the Initiating Member at the price as set forth in the first offer to the Responding Member, or (b) such Responding Member's agreement to purchase all of the Membership Interests of the Initiating Member at the price as set forth in the first offer to the Responding Member. The purchase price for Membership Interests to be sold and purchased under this Section 9.3 shall be paid fully in cash. The Transfer described in this Section 9.3 shall occur within 30 days following the Responding Member's notification of his, her, or its response to the Initiating Member's offer. Notwithstanding anything in this Agreement to the contrary, in the event of a Transfer as described in this Section 9.3, the Member selling its Membership Interests shall cease to be a Member of the Company and such selling Member's obligations under any restrictive covenants, save and except those relating to confidentiality of confidential information belonging to another Member, shall be terminated.

### Article 10. Member Covenants and Agreements

10.1   <u>Representations and Warranties.</u> Each Member warrants to the Company and the other Members that: (a) it is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization and that it has full organizational power to execute and agree hereto and to perform its obligations hereunder; (b) it is acquiring its interest in the Company for its own account without an intent to distribute the interest; and (c) its interests have not been registered under the Securities Act of 1933 or any state securities laws, and may not be

                                          BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

resold or transferred without appropriate registration or the availability of an exemption from such requirements.

10.2    Confidentiality.

10.2.1.    "Confidential Information" means all confidential, non-public and/or proprietary information, regardless of whether it is in tangible or intangible form and regardless of how marked, disclosed or furnished by or on behalf of a Disclosing Member, or received or learned by the Receiving Member, in connection herewith. For the purposes hereof, "Disclosing Member" means that Member which discloses Confidential Information or from which Confidential Information originates hereunder and "Receiving Member" means the Member that receives Confidential Information from the Disclosing Member. Confidential Information shall include: (a) client lists and contact information; staffing and compensation information; trade secrets; financial, technical, commercial, revenue, cost, and expense data; market and customer information; supplier and vendor information; technical information; business methods; contracts; agreements; and any and all information related to the assets, liabilities, operations, and/or business of the Disclosing Member that is not generally known to the public, whether patented or not, developed and/or owned by the Disclosing Member or to which the Disclosing Member has obtained rights by license or otherwise; (b) any and all notes, analyses, compilations, studies, memoranda, correspondence, drawings, and computer software that contains, discusses, or otherwise reflects any of the preceding information; and (c) the substance of any and all negotiations or communications between the Members relating hereto or the Business.

10.2.2.    Notwithstanding any provision hereof, Confidential Information shall not include information that: (a) is shown by the Receiving Member to be in the public domain at the time of receipt or came into the public domain thereafter through no act of the Receiving Member in breach hereof; (b) was known by or in the possession of the Receiving Member, as established by documentary evidence, prior to being disclosed by or on behalf of the Disclosing Member pursuant hereto; (c) at the time of disclosure is, or thereafter becomes, available to the Receiving Member on a nonconfidential basis from a Person other than the Disclosing Member who is not known by the Receiving Member to be otherwise bound by a confidentiality agreement with the Disclosing Member, or otherwise under an obligation to the Disclosing Member not to transmit the information to the Receiving Member; or (d) was or is independently developed by the Receiving Member, as established by documentary evidence, without use of or reference to any Confidential Information received hereunder.

10.2.3.    The Members acknowledge and agree that the unauthorized disclosure or use by a Receiving Member of a Disclosing Member's Confidential Information would damage the business and financial condition of the Disclosing Member. Each Receiving Member agrees that it shall: (a) protect and hold Confidential Information in confidence, applying the same degree of care that it applies to its own Confidential Information of a like nature, but in no event less than a commercially reasonable standard of care; (b) use Confidential Information only to the extent necessary for purposes of performing a Member's obligations hereunder; (c) not divulge, communicate, disclose, or otherwise make available to a Person any Confidential Information for any purpose, except to its employees, officers, directors, managers, agents, or professional advisors who have a need to know in connection herewith and who are made aware of this Agreement and agree to be bound by its provisions; and (d) be responsible for any breach hereof caused by any of its employees, officers, directors, managers, agents, or professional advisors. Notwithstanding the

LIMITED LIABILITY COMPANY AGREEMENT

termination hereof, the rights and obligations of the Members relating to use and disclosure of Confidential Information shall continue for a period of five years following the date of the last disclosure of Confidential Information.

10.2.4.   Notwithstanding the foregoing restrictions on disclosure, this Agreement shall not preclude the disclosure of Confidential Information if: (a) such disclosure is required by Law, legal process, or public contract; (b) such disclosure is required by a Governmental Authority; or (c) the Business requires such disclosure, and the Disclosing Member consents in writing prior to such disclosure (which consent shall not be unreasonably conditioned, withheld, or delayed).

10.2.5.   The Disclosing Member's Confidential Information, including all copies thereof, is and shall always remain the property of the Disclosing Member. Nothing herein shall prohibit or restrict any Member's right to develop, use, or market products or services like or competitive with those of the other Member if such actions do not thereby breach this Agreement. Each Member acknowledges that the other Member may already possess or have developed products or services like or competitive with those of the other Member disclosed in the Confidential Information. No Member shall use the name, trade name, trademark, logo, acronym, abbreviation, or other designation of the other in connection with any advertising or publicity materials other otherwise without the prior written consent of the other Member. No provision hereof or any disclosure of Confidential Information hereunder will be deemed to assign, transfer, or license (directly or by implication, estoppel or otherwise, whether under any copyright, patent, patent application, or otherwise) any right, title, or interest in any Confidential Information to the Receiving Member or any of its employees, officers, directors, managers, agents, or professional advisors.

10.2.6.   To the extent that any Confidential Information may include materials subject to the attorney-client privilege, work product doctrine, or any other privilege concerning pending or threatened legal proceedings or governmental investigations, the Members understand and agree that the Members have a commonality of interest with respect to such matters and it is the Members' desire, intention, and understanding that the sharing of such material is not intended to, and shall not, waive or diminish in any way the confidentiality of such material or its continued protection under the attorney-client privilege, work product doctrine, or other privilege. All Confidential Information provided by a Disclosing Member that is entitled to protection under the attorney-client privilege, work product doctrine, or other privilege shall remain entitled to such protection under these privileges, this Agreement, and under the joint defense doctrine.

10.2.7.   The obligations of each Member under this Section 10.2 shall survive: (a) the termination, dissolution, liquidation and winding up of the Company; and (b) such Member's Transfer of its Membership Interest.

10.3   Noncompetition; Non-solicitation.

10.3.1.   Each Member hereby agrees that, for so long as it or its Permitted Transferee, directly or indirectly, owns a Membership Interest (the "Restricted Period"), such Member shall not (and it shall cause its Affiliates not to): (a) engage in the Business; or (b) through one or more of its Affiliates, own, manage, operate, control, or participate in the ownership, management, operation, or control of any Competitor; provided, that nothing in this Section 10.3.1 shall prohibit such Member or any of its Affiliates from acquiring or owning: (x) up to 5% of the aggregate voting securities of any Competitor that is a publicly traded Person; or (y) up to 5% of the aggregate voting securities of any Competitor that is not a publicly traded Person, so long as

LIMITED LIABILITY COMPANY AGREEMENT

such interest is passive and neither such Member nor any of its Affiliates designates a member of the board of directors (or similar body) of such Competitor or its Affiliates or otherwise has an active role in the governance of such Person. For purposes of this Section 10.3.1, "Competitor" means any other Person engaged in the Business.

10.3.2.    In light of each Member's access to Confidential Information and position of trust and confidence, each Member further agrees that, during the Restricted Period and for a period of 12 months after, neither it nor any of its Affiliates shall solicit for employ or encourage any other Person to hire or solicit for employ, any individual who has been employed by the Company or any other Member within 12 months prior to the date of such hiring or solicitation for employment, or encourage any such individual to leave such employment, unless approved in writing by the applicable Member or by unanimous consent of the Members on behalf of the Company. This Section 10.3.2 shall not prevent a Member or its Affiliates from hiring or soliciting any employee or former employee of the Company or another Member who responds to a general solicitation that is a public solicitation of prospective employees and not directed to any Person.

10.3.3.    In light of each Member's access to Confidential Information and position of trust and confidence with the Company, each Member further agrees that, during the Restricted Period, neither it nor any of its Affiliates shall solicit or entice, or attempt to solicit or entice, any clients, customers, or suppliers of the Company for purposes of diverting their business or services from the Company.

10.3.4.    If any court of competent jurisdiction determines that any of the covenants set forth in this Section 10.3, or any part thereof, is unenforceable because of the duration or geographic scope of such provision, such court shall have the power to modify any such unenforceable provision in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Section 10.3 or by making such other modifications as warranted to carry out the intent and agreement of the Members, as embodied herein, to the maximum extent permitted by Law. The Members expressly agree that this Agreement as so modified by the court shall be binding on and enforceable against all of them.

10.4    Change of Control Notice. In the event of a Change of Control of a Member, such Member shall promptly, but not later than three days following such Change of Control, notify the other Members in writing thereof (a "Change of Control Notice"), setting forth the date and identity of the party or parties that have acquired control of such Member. "Change of Control" means, with respect to a Member: (a) any Person or group of Persons acting in concert acquires or agrees to acquire that percentage of the ownership interests of such Member or Person controlling such Member (each, a "Target") that provides or shall provide the acquirer with a sufficient number of the Target's ownership interests having general voting rights to elect a majority of its directors or corresponding governing body; (b) any merger, consolidation, or similar business combination of such Target into or with another Person as a result of which holders of the voting securities of such Target immediately prior to the consummation of the transaction hold immediately following the consummation of the transaction, equity interests in the surviving entity in such transaction possessing less than a majority of the voting power of such surviving entity; or (c) any other transaction, including the sale by such Target of new equity interests or a transfer of existing equity interests of such Target, the result of which is that any other Person or group of related Persons acquires beneficial ownership (as defined in the Securities Exchange Act of 1934) of equity interests of such Target representing a majority of such Target's voting power or a majority of the assets of such Target.

BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

10.5 <u>Related-party Transactions.</u> The Company shall not enter into, enter into any commitment to enter into, extend, amend in any material respect, waive, supplement, or terminate (other than pursuant to its terms) any Related-party Agreement other than Related-party Agreements that are approved by all Members or reasonably required by the Company on terms that are not less favorable to the Company than those that would have been obtained in a comparable transaction entered into with an unaffiliated Person on an arm's-length basis.

### Article 11 Accounting and Tax Matters

11.1 <u>Financial Statements.</u> The Company shall furnish to each Member the following reports:

11.1.1. As soon as available, and in any event within 120 days after the end of each Fiscal Year, audited consolidated balance sheets of the Company as at the end of each such Fiscal Year and audited consolidated statements of income, cash flows, and Members' equity for such Fiscal Year, in each case setting forth in comparative form the figures for the previous Fiscal Year, accompanied by the certification of independent certified public accountants of recognized national standing selected by the Board, certifying to the effect that, except as set forth therein, such financial statements have been prepared in accordance with GAAP, applied consistently with prior years, and fairly present in all material respects the financial condition of the Company as of the dates thereof and the results of their operations and changes in their cash flows and Members' equity for the periods covered thereby.

11.1.2. As soon as available, and in any event within 45 days after the end of each quarterly accounting period in each Fiscal Year (other than the last fiscal quarter of the Fiscal Year), unaudited consolidated balance sheets of the Company as at the end of each such fiscal quarter and for the current Fiscal Year to date and unaudited consolidated statements of income, cash flows and Members' equity for such fiscal quarter and for the current Fiscal Year to date, in each case setting forth in comparative form the figures for the corresponding periods of the previous fiscal quarter, all in reasonable detail and all prepared in accordance with GAAP, consistently applied (subject to normal year-end audit adjustments and the absence of notes thereto), and certified by the principal financial or accounting officer of the Company.

11.1.3. As soon as available, and in any event within 30 days after the end of each monthly accounting period in each fiscal quarter (other than the last month of the fiscal quarter), unaudited consolidated balance sheets of the Company as at the end of each such monthly period and for the current Fiscal Year to date and unaudited consolidated statements of income, cash flows, and Members' equity for each such monthly period and for the current Fiscal Year to date, all in reasonable detail and all prepared in accordance with GAAP, consistently applied (subject to normal year-end audit adjustments and the absence of notes thereto).

11.2 <u>Inspection Rights.</u> Subject to Section 10.1, upon reasonable notice from a Member, the Company shall afford such Member and its Representatives access during normal business hours to: (a) the Company's properties, offices, plants, and other facilities; (b) the corporate, financial and similar records, reports, and documents of the Company, including all records, minutes of proceedings, internal management documents, reports of operations, reports of adverse developments, copies of any management letters, and communications with Members, and to permit each Member and its Representatives to examine such documents and make copies thereof or extracts therefrom; and (c) any Officers, senior employees, and accountants of the Company, and to afford each Member and its Representatives the opportunity to discuss and advise on the affairs, finances, and accounts of the Company with such Officers, senior employees ,and accountants (and the Company hereby authorizes such employees and

BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

accountants to discuss with such Member and its Representatives such affairs, finances, and accounts); provided that: (y) the requesting Member shall bear its own expenses and all reasonable expenses incurred by the Company in connection with any inspection or examination requested by such Member pursuant to this Section 11.2; and (z) if the Company provides or makes available any report or written analysis to or for any Member pursuant to this Section 11.2, it shall promptly provide or make available such report or analysis to or for the other Members.

11.3    <u>Income Tax Status.</u> It is the intent of the Company and the Members that the Company shall be treated as a partnership for U.S., federal, state, and local income tax purposes. Neither the Company nor any Member shall make an election for the Company to be classified as other than a partnership pursuant to Treasury Regulations § 301.7701-3.

11.4    <u>Tax Matters Representative.</u>

11.4.1.    The Members hereby appoint Brittany Perkins Castillo as the "partnership representative" as provided in Code § 6223(a) (the "Tax Matters Representative"). The Tax Matters Representative may resign at any time. The Tax Matters Representative may be removed at any time by unanimous consent of the Members. In the event of the resignation or removal of the Tax Matters Representative, the Members shall select a replacement.

11.4.2.    The Tax Matters Representative is authorized to represent the Company in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The Tax Matters Representative shall promptly notify the Members in writing of the commencement of any tax audit of the Company, upon receipt of a tax assessment and upon the receipt of a notice of final partnership adjustment, and shall keep the Members reasonably informed of the status of any tax audit and resulting administrative and judicial proceedings. The Tax Matters Representative shall not take any actions in a tax audit or proceeding, including extending the statute of limitations, filing a request for administrative adjustment, filing suit relating to any Company tax refund or deficiency, entering into any settlement agreement relating to items of income, gain, loss, or deduction of the Company, or making any elections or other determinations, without the unanimous consent of the Members.

11.4.3.    To the extent permitted by Law and regulations, the Tax Matters Representative shall cause the Company to annually elect out of the partnership audit procedures set forth in Subchapter C of Chapter 63 of the Code as amended by the Bipartisan Budget Act of 2015 (the "Revised Partnership Audit Rules") pursuant to Code § 6221(b). For any year in which Law and regulations do not permit the Company to elect out of the Revised Partnership Audit Rules, then within forty-five (45) days of any notice of final partnership adjustment, the Tax Matters Representative shall cause the Company to elect the alternative procedure under Code § 6226, and furnish to the Internal Revenue Service and each Member during the year or years to which the notice of final partnership adjustment relates a statement of the Member's share of any adjustment set forth in the notice of final partnership adjustment.

11.4.4.    Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return. Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes and any taxes imposed pursuant to Code § 6226) shall be

BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

paid by such Member and if required to be paid by the Company, shall be recoverable from such Member as provided in Section 5.3.4.

11.4.5. The Company shall make an election under Code § 754, if requested in writing by a Member.

11.4.6. The Company shall defend, indemnify, and hold harmless the Tax Matters Representative against any and all liabilities sustained as a result of any act or decision concerning Company tax matters and within the scope of the Tax Matters Representative's responsibilities, so long as such act or decision was done or made in good faith and does not constitute gross negligence or intentional misconduct.

11.4.7. This Section 11.4 and the obligations of a Member or former Member pursuant to Section 11.4 shall survive the termination, dissolution, liquidation, and winding up of the Company and the Transfer of a Member's Membership Interest.

11.5 <u>Tax Returns.</u> At the expense of the Company, the Board (or any Officer that it may designate) shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company owns property or does business. As soon as reasonably possible after the end of each Fiscal Year, the Board or designated Officer shall cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065 and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state, and local income tax returns for such Fiscal Year.

11.6 <u>Company Funds.</u> All funds of the Company shall be deposited in its name, or in such name as may be designated by the Board, in such checking, savings, or other accounts, or held in its name in the form of such other investments as shall be designated by the Board. The funds of the Company shall not be commingled with the funds of any other Person. All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of such Officer or Officers as the Board may designate.

## Article 12. Dissolution and Liquidation

12.1 <u>Events of Dissolution.</u> The Company shall be dissolved, and its affairs wound up upon the occurrence of any of the following events: (a) the unanimous determination of the Members to dissolve the Company; (b) the Bankruptcy of a Member, unless within 21 days after the occurrence of such Bankruptcy, the other Members agree in writing to continue the business of the Company; (c) at the election of a Member that is not a Defaulting Member, acting in its discretion, made at such time as all other Members are Defaulting Members (and without limitation of any other rights or remedies that may be available to such electing Member); (d) the sale, exchange, involuntary conversion or other disposition or transfer of all or substantially all the assets of the Company; (e) upon all Members being or becoming Defaulting Members, unless the Members, acting in their discretion, agree within 21 days thereafter to continue the business of the Company (and without limitation of any other rights or remedies that may be available); provided, however, that the Board shall carry out the winding up process in accordance with Article 6 as if all Members were not Defaulting Members; or (f) the entry of a decree of judicial dissolution under the Act.

12.2 <u>Effectiveness of Dissolution.</u> Dissolution of the Company shall be effective on the day on which the event described in Section 12.1 occurs, but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in Section 12.3, and the Certificate has been cancelled as provided in Section 12.4.

BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

12.3    Liquidation. If the Company is dissolved pursuant to Section 12.1, the Company shall be liquidated, and its business and affairs wound up in accordance with the Act and the following:

12.3.1.    The Board shall act as liquidator to wind up the Company (the "Liquidator"); provided that, notwithstanding anything herein to the contrary, if the Company is being dissolved based on the Bankruptcy of or a default by a Member, the other Members shall act as Liquidator. The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner; provided that, if the Board is the Liquidator, it shall act in accordance with Article 6 until the winding up occurs.

12.3.2.    As promptly as possible after dissolution and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

12.3.3.    The Liquidator shall liquidate the assets of the Company and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by Law: (a) first, to the payment of all of the Company's debts and liabilities to its creditors (including Members) and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company); (b) second, to the establishment of and additions to reserves that are determined by the Liquidator to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and (c) third, to the Members in accordance with the positive balances in their Capital Accounts, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the Company occurs.

12.3.4.    Notwithstanding the provisions of Section 12.3.3 that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 12.3.3, if upon dissolution of the Company the Liquidator reasonably determines that an immediate sale of part or all of the Company's assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may, upon unanimous consent of the Members, distribute to the Members, in lieu of cash, as tenants in common and in accordance with Section 12.3.3, undivided interests in such Company assets as the Liquidator determines as not suitable for liquidation. Any such distribution in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator determines is reasonable and equitable and to any agreements governing the operation of such properties at such time. For purposes of any such distribution, any property to be distributed shall be valued at its Fair Market Value, as determined by the Liquidator in good faith.

12.4    Cancellation of Certificate. Upon completion of the distribution of the assets of the Company as provided in Section 12.3.3, the Company shall be terminated and the Liquidator shall cause the cancellation of the Certificate and of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Florida and shall take such other actions as may be necessary to terminate the Company.

12.5    Survival of Rights, Duties, and Obligations. Dissolution, liquidation, winding up, or termination of the Company shall not release any party from any Loss that at the time of such dissolution, liquidation, winding up, or termination already had accrued to any other party or

LIMITED LIABILITY COMPANY AGREEMENT

thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up or termination. None of the foregoing shall replace, diminish, or otherwise adversely affect any Member's right to indemnification pursuant to Section 8.3.

12.6    Recourse for Claims. Each Member shall look to the assets of the Company for all distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Income, Net Loss ,and other items of income, gain, loss, and deduction, and shall have no recourse (upon dissolution or otherwise) against the Liquidator or any other Member.

## Article 13. Dispute Resolution

13.1    Board Dispute. If the Board disagrees regarding any issue that materially and adversely affects the Company (a "Dispute"), then the Managers shall consult and negotiate with each other in good faith to find an agreeable solution. If the Managers do not reach a solution within seven days from the date the disagreement occurred, then the Board shall provide notice to the Members (a "Dispute Notice").

13.2    Consideration by Member Executives. Within three days after the giving of the Dispute Notice, the Dispute shall be referred by the Board to the senior executive of each Member (each, a "Member Executive") in an attempt to reach resolution. Meetings of the Member Executives may be held either in person or by telephone or video conference or other communication device that permits all Member Executives participating in the meeting to hear each other. If the Member Executives are unable to resolve the Business Dispute within 14 days after the date of the Dispute Notice, or such longer period as they may agree in writing, then the mediation provisions herein shall apply.

13.3    Continuation of Responsibilities. In all other respects, each Member shall continue to meet and exercise its powers and fulfill its responsibilities hereunder notwithstanding any action taken by any Member regarding any Business Dispute.

13.4    Nonbinding Mediation. Prior to binding arbitration, the Members shall endeavor to settle Disputes by nonbinding mediation before a neutral Person. Mediation shall be conducted in conformity with the procedures published by the American Arbitration Association under its Commercial Mediation Procedures ("Mediation Procedures"). Any conflict between the Mediation Procedures and this Agreement shall be resolved in favor hereof. A demand for mediation shall be made within a reasonable time after the Dispute has arisen. In no event shall the demand for mediation be made after the date when institution of legal, equitable, or arbitration proceedings based on the Dispute would be barred by the statute of repose or limitations. The Members shall select a single mediator by agreement. If the Members are unable to agree on a mediator, the Member requesting mediation shall submit the matter to the American Arbitration Association, and a single mediator shall be selected pursuant to the American Arbitration Association's rules. The costs of the mediator shall be borne equally by the Members. The mediation proceedings shall be maintained by the Members and mediator as strictly confidential.

13.5    Binding Arbitration. If the Dispute remains unresolved at the conclusion of the mediation process, a Member may submit the dispute for resolution by final binding confidential arbitration. A demand for arbitration shall be made within a reasonable time after the claim, dispute, or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on the Dispute would be barred by the statute of repose or limitations. Arbitration shall be conducted in conformity with the Commercial Arbitration Rules published by the American Arbitration Association or successor rules ("Arbitration Rules"). Any conflict between the Arbitration Rules and this Agreement shall be resolved in favor hereof. The Members shall select a single arbitrator by agreement. If the Members are unable to agree on an arbitrator, the Member requesting arbitration shall submit the matter to the American Arbitration Association, and a

BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

single arbitrator shall be selected pursuant to the American Arbitration Association's rules. The burden of proof shall always be on the Member seeking relief. In reaching a decision, the arbitrator shall apply the governing Law applicable to the claims, causes of action, and defenses asserted by the Members. The arbitrator shall have the power to decide dispositive motions and to award all remedies that could be awarded by a court or administrative agency in accordance with Law. The arbitrator shall render a decision and award within 30 days after the close of the arbitration hearing or at any later time on which the Members may agree. The decision shall be in writing and signed and dated by the arbitrator and shall contain express legal and factual bases for the decision. Any decision by the arbitrator shall be final and binding, and except in the cases of fraud or gross misconduct by the arbitrator, the decision rendered shall not be appealable. The arbitral proceedings and decision shall be maintained by the Members and arbitrator as strictly confidential, except as is otherwise required by Law, an order from a court of competent jurisdiction, or as is necessary to confirm, vacate, or enforce any arbitral award and for disclosure in confidence to the Members' attorneys and tax advisors. The arbitrator's fees and expenses shall be borne equally by the Members, unless otherwise directed by the arbitrator pursuant to Law. All other expenses associated with the arbitration, including each Member's legal fees, shall be borne by the Member incurring the expense.

13.6    Forum; Waiver of Right to Trial. The forum for any mediation or arbitration shall be in a location agreed to by the Members. EXCEPT AS EXPRESSLY PROVIDED HEREIN, EACH MEMBER IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL IN COURT BY JUDGE OR JURY IN RESPECT OF ANY DISPUTE ARISING OUT OF OR RELATING HERETO OR THE TRANSACTIONS CONTEMPLATED HEREBY.

13.7    Equitable Remedies. Each Member acknowledges that a breach or threatened breach by such Member of any of its obligations hereunder would give rise to irreparable harm to the other Members, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such Member of any such obligations, each of the other Members hereto shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond). With respect to disputes arising hereunder that are submitted to a court rather than an arbitrator, including actions to compel arbitration or for equitable relief in aid of arbitration, the Members agree that venue and jurisdiction are proper in any state or federal court within the State of Florida and consent to the jurisdiction and venue of such courts for the purpose of any proceedings contemplated by this Agreement.

## Article 14 Intellectual Property

14.1    Independently Developed Intellectual Property. Each Invention conceived or first reduced to practice by one or more employees of the Members and resulting from the exchange of information during the course hereof relative to carrying out the Business shall be the property of the Member whose employee or employees conceived the Invention or reduced it to practice; provided, however, that the other Members shall have, and the owning Member hereby grants, an irrevocable, unrestricted, non-exclusive, and royalty-free license worldwide to use such Invention and the right to sublicense its use to its parent corporation and subsidiaries, and the sublicensed subsidiaries and parent corporation shall have the right to sublicense its use to their subsidiaries, which licenses and sublicenses shall include the right to grant sublicenses to third parties to the extent the non-participating Member was legally obligated to such a third firm, individual, or entity to do so or to assure freedom from infringement liability existing as of the time this Agreement was executed.

                                                          BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

14.2 <u>Jointly Developed Intellectual Property.</u> Any Inventions conceived or first reduced to practice jointly by employees of multiple Members and resulting from the exchange of information during the course hereof relative to carrying out the Business shall be jointly owned by the Members, without accounting ("Joint Inventions"). Patent applications covering such Joint Inventions shall be filed by attorneys acceptable to the Members and the cost thereof shall be shared equally. The Members further agree to share equally all issuance and maintenance costs for any patent resulting from a Joint Invention. In the event that one Member does not desire to file a patent application covering a Joint Invention in any country or not to share equally in the cost thereof, the other Member(s) shall have the right, at their own expense, to file such application and shall have full control over its prosecution; be the owner of all patents issued thereon; and have full control over the maintenance thereof, including the right to terminate the patents at any time. The non-participating Member shall be granted an irrevocable, unrestricted, non-exclusive, and royalty-free license worldwide to use such Invention and the right to sublicense its use to its parent corporation and subsidiaries, and the sublicensed subsidiaries and parent corporation shall have the right to sublicense its use to their subsidiaries, which licenses and sublicenses shall include the right to grant sublicenses to third parties to the extent the non-participating Member was legally obligated to such a third firm, individual, or entity to do so or to assure freedom from infringement liability existing as of the time this Agreement was executed.

14.3 <u>Preexisting Intellectual Property.</u> Except for rights expressly granted hereunder, each Member shall retain exclusive interest in, and ownership of, its Intellectual Property developed before this Agreement or developed outside the scope hereof. Nothing contained herein: (a) will be deemed to grant either directly or by implication, estoppel, or otherwise, any license under any patent or patent application arising out of any other invention or intellectual property of any Member; or (b) shall be construed as affecting the scope of any license or other right otherwise granted to a Member under any patent or patent application.

14.4 <u>Promotional Materials; Media Relations.</u> Each Member shall designate a single Communications Lead. All promotional materials, media communications, and press releases of any kind, including social media communications, shall be managed jointly by the Communications Leads, including the approval and authorization of the content of all such communications. In releases by any Person, materials depicting or relating to any work or services of the Company shall be identified as work of the Company; provided, each Member may designate in any such materials any work performed by it. Each Member may remove any Communications Lead appointed by it at any time with or without cause, effective upon notice to the other Members and the Board.

## Article 15. Miscellaneous

15.1 <u>Interpretation.</u> For purposes of this Agreement: (a) the words "include," "includes," and "including" will be deemed to be followed by the words "without limitation;" (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole. The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. Unless the context otherwise requires, references herein: (x) to Articles, Sections, and Exhibits mean the Articles and Sections of, and Exhibits attached to, this Agreement; (y) to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, or modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the Member drafting an instrument or

                    BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

causing any instrument to be drafted. All Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

15.2   Expenses. Except as otherwise expressly provided herein, all expenses, including fees and disbursements of counsel, financial advisors, and accountants, incurred in connection with the preparation and execution hereof, or any amendment or waiver hereof, and the transactions contemplated hereby shall be paid by the Member incurring such expenses.

15.3   Further Assurances. In connection herewith and the transactions contemplated hereby, the Company and each Member hereby agrees, at the request of the Company or any Member, to execute such additional documents, instruments, conveyances, and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

15.4   Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and will be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by fax or email (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 15.4):

| If to the Company: | If to ABML: | If to IEM: |
|---|---|---|
| ABML–IEM, LLC<br>Attn: Brittany P. Castillo<br>565 East Hillsboro Blvd<br>Deerfield Beach, FL, 33441<br>brittany@ashbritt.com<br>Phone: 954.725.6992<br>Fax: 954.725.6991 | ABML<br>Attn: Legal<br>565 East Hillsboro Blvd<br>Deerfield Beach, FL, 33441<br>brittany@ashbritt.com<br>Phone: 954.725.6992<br>Fax: 954.725.6991 | IEM<br>Attn: Legal<br>2801 Slater Rd, Ste 200<br>Morrisville, NC 27560<br>legal@iem.com<br>Phone: 919.990.8191<br>Fax: 919.237.7468 |
| And: | Copy to: | Copy to: |
| ABML–IEM, LLC<br>Attn: Brad Tiffee<br>2801 Slater Rd, Ste 200<br>Morrisville, NC 27560<br>legal@iem.com<br>Phone: 919.990.8191<br>Fax: 919.237.7468 | Rogers Joseph O'Donnell PC<br>Attn: Neil H. O'Donnell<br>Robert Dollar Building<br>311 California St, 10 Fl<br>San Francisco, CA 94104<br>nodonnell@rjo.com<br>Phone: 415.956.2828<br>Fax: 415.956.6457 | Spencer Fane LLP<br>Attn: Davis Bradford<br>3040 Post Oak Blvd<br>Ste 1300<br>Houston, TX 77056<br>dbradford@spencerfane.com<br>Phone: 713.552.1234<br>Fax: 713.963.0859 |

15.5   Headings. The headings herein are inserted for convenience or reference and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent hereof or any provision hereof.

15.6   Severability; Standard for Interpretation. If any term or provision hereof is held to be invalid, illegal, or unenforceable under Law in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision hereof or invalidate or render unenforceable such term or provision in any other jurisdiction. Except as provided in Section 8.3 or Section 10.3.4, upon such determination that any term or other provision is invalid,

                    BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

illegal, or unenforceable, the Members shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Members as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible. Whenever two or more interpretations of the provisions or wording hereof shall be possible, the interpretation or construction which leads to the enforceability or validity of any provision hereof shall be the favored and will be deemed to be the intended interpretation of the Members.

15.7    <u>Entire Agreement.</u> This Agreement, the Certificate, and all related Exhibits, constitutes the entire agreement of the Members with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

15.8    <u>Successors and Assigns.</u> Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and benefits the Members and their heirs, executors, administrators, successors, and permitted assigns. This Agreement may not be assigned by any Member except as permitted hereby and any assignment in violation hereof shall be void *ab initio*.

15.9    <u>No Other Beneficiaries.</u> Except as provided in Article 7, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the benefit of the Members (and their heirs, executors, administrators, successors, and permitted assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason hereof.

15.10   <u>Publicity.</u> Any news release, public announcement, advertisement, or other form of publicity released or disclosed concerning this Agreement, the Business, or the Company shall be subject to the unanimous approval of the Communications Leads. Any news release, public announcement, advertisement, or other form of publicity shall give due credit to the contribution of each Member.

15.11   <u>No Circumvention.</u> No Member shall, without the prior written consent of the other Members: (a) attempt in any manner to deal in any manner with any individuals or entities with respect to the Business, including having any part of or deriving any benefit from the Business or any aspect thereof; (b) bypass, compete, avoid, circumvent, or attempt to circumvent the other Member relative to the Business, including using any of the Confidential Information or by otherwise exploiting or deriving any benefit from the Confidential Information; or (c) entertain, seek to solicit, induce, bring about, influence, promote, facilitate, or encourage any other Person to enter into any agreement with respect to the Business in contravention hereof. This non-circumvention provision shall be construed liberally in favor to the greatest extent permitted by Law. Notwithstanding the foregoing, this Agreement shall relate only to the Business, and nothing herein will be deemed to: (x) confer any right or impose any obligation or restriction on any Member with respect to other efforts or activities at any time undertaken by any Member herein which does not pertain to the Business; (y) preclude any Member from independently soliciting or accepting any contract not related to the Business; or (z) limit the rights of any Member to independently promote, market, sell, lease, license, or otherwise dispose of its standard products or services apart from the Business.

15.12   <u>Amendment.</u> No provision hereof may be amended or modified except by an instrument in writing executed by all Members. Any such written amendment or modification shall be binding upon the Company and each Member.

15.13   <u>Waiver.</u> No waiver by any Member of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Member so waiving. No waiver by any Member shall operate or be construed as a waiver in respect of any failure, breach, or default not

BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. Nothing contained in this Section 15.13 shall diminish any of the explicit and implicit waivers described herein.

15.14   Governing Law. All issues and questions concerning the application, construction, validity, interpretation, and enforcement hereof shall be governed by and construed in accordance with the internal laws of the State of Florida, without giving effect to any choice or conflict of law provision or rule (whether of the State of Florida or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Florida.

15.15   Remedies Cumulative. Except as expressly provided herein to the contrary, the rights and remedies hereunder are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

15.16   Counterparts. This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement. A signed copy hereof delivered by Electronic Transmission will be deemed to have the same legal effect as delivery of an original signed copy hereof.

## Article 16. Definitions

16.1   "Act" has the meaning specified in Section 1.1.

16.2   "Additional Capital Contribution" has the meaning specified in Section 2.2.1.

16.3   "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments: (a) crediting to such Capital Account any amount that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations §§ 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1), and 1.704-2(i); and (b) debiting to such Capital Account the items described in Treasury Regulations §§ 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

16.4   "Affiliate" means, with respect to any Person, any other Person who (including through one or more intermediaries) controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings; provided, however, that the term "Affiliate" does not, when used with respect to a Member, include the Company.

16.5   "Agreement" has the meaning specified in the preamble.

16.6   "Arbitration Rules" has the meaning specified in Section 13.5.

16.7   "ABML" has the meaning specified in the preamble.

16.8   "ABML Manager" has the meaning specified in Section 6.2.

16.9   "Bankruptcy" means, with respect to a Member, the occurrence of any of the following: (a) the filing of an application by such Member for, or a consent to, the appointment of a trustee of such Member's assets; (b) the filing by such Member of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Member's inability to pay its debts as they come due; (c) the making by such Member of a general assignment for the benefit of such Member's creditors; (d) the filing by such Member of an answer admitting the

LIMITED LIABILITY COMPANY AGREEMENT

material allegations of, or such Member's consenting to, or defaulting in answering a bankruptcy petition filed against such Member in any bankruptcy proceeding; or (e) the expiration of 60 days following the entry of an order, judgment, or decree by any court of competent jurisdiction adjudicating such Member bankrupt or appointing a trustee of such Member's assets.

16.10   "Board" has the meaning specified in Section 6.1.

16.11   "Book Depreciation" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization, or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the Board in accordance with Treasury Regulations § 1.704-1(b)(2)(iv)(g)(3).

16.12   "Book Value" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows: (a) the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross Fair Market Value of such Company asset as of the date of such contribution; (b) immediately prior to the distribution by the Company of any Company asset to a Member, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such distribution; (c) the Book Value of all Company assets shall be adjusted to equal their gross Fair Market Values, as reasonably determined (except as otherwise provided for herein) by unanimous consent of the Members, as of the acquisition of an additional Membership Interest by a new or existing Member in consideration for more than a de minimis Capital Contribution, the distribution by the Company to a Member of more than a de minimis amount of property (other than cash) in exchange for all or a part of such Member's Membership Interest, and the liquidation of the Company within the meaning of Treasury Regulations § 1.704-1(b)(2)(ii)(g); (d) the Book Value of each Company asset shall be increased or decreased to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to the Internal Revenue Code of 1986 ("Code") § 734(b) or Code § 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations § 1.704-1(b)(2)(iv)(m), provided that Book Values shall not be adjusted to the extent that an adjustment is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this paragraph; and (e) if the Book Value of a Company asset has been determined or adjusted, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Income and Net Losses.

16.13   "Business" has the meaning specified in the recitals.

16.14   "Business Opportunity" has the meaning specified in Section 6.12.2.

16.15   "Capital Account" has the meaning specified in Section 2.3.

16.16   "Capital Contribution" means, for any Member, the total amount of cash and cash equivalents and the Book Value of any property contributed to the Company by such Member.

16.17   "Certificate" has the meaning specified in Section 1.7.

16.18   "Chairperson" has the meaning specified in Section 6.9.

LIMITED LIABILITY COMPANY AGREEMENT

16.19 "Change of Control" has the meaning specified in Section 10.4.

16.20 "Change of Control Notice" has the meaning specified in Section 10.4.

16.21 "Communications Lead" has the meaning specified in Section 14.4.

16.22 "Company" has the meaning specified in the recitals.

16.23 "Company Interest Rate" has the meaning specified in Section 5.3.3.

16.24 "Company Minimum Gain" means "partnership minimum gain" as defined in Treasury Regulations § 1.704-2(b)(2), substituting the term "Company" for the term "partnership" as the context requires.

16.25 "Competitor" has the meaning specified in Section 10.3.1.

16.26 "Confidential Information" has the meaning specified in Section 10.2.

16.27 "Contributing Member" has the meaning specified in Section 2.2.2.

16.28 "Covered Person" means: (a) each Member; (b) each officer, director, shareholder, partner, member, Affiliate, employee, agent, or representative of each Member, and each of their Affiliates; and (c) each Manager, Officer, employee, agent, or representative of the Company.

16.29 "Default Amount" has the meaning specified in Section 2.2.2.

16.30 "Default Loan" has the meaning specified in Section 2.2.2.

16.31 "Default Rate" has the meaning specified in Section 2.2.2.

16.32 "Defaulting Member" means a Member that has failed to make an Additional Capital Contribution pursuant to Section 2.2 for so long as it is a Non-Contributing Member or that has breached any material covenant, duty, or obligation hereunder and such breach remains uncured for seven days after notifying such Member of the breach.

16.33 "Disclosing Member" has the meaning specified in Section 10.2.

16.34 "Dispute" has the meaning specified in Section 13.1.

16.35 "Dispute Notice" has the meaning specified in Section 13.1.

16.36 "Electronic Transmission" means any form of communication not involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be reproduced in paper form by such a recipient through an automated process.

16.37 "Estimated Tax Amount" of a Member for a Fiscal Year means the Member's Tax Amount for such Fiscal Year as estimated in good faith from time to time by the Board. In making such estimate, the Board shall take into account amounts shown on Internal Revenue Service Form 1065 filed by the Company and similar state or local forms filed by the Company for the preceding taxable year and such other adjustments as the Board reasonably determines are necessary or appropriate to reflect the estimated operations of the Company for the Fiscal Year.

16.38 "Excess Amount" has the meaning specified in Section 5.2.3.

16.39 "Fair Market Value" of any asset as of any date means the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's length transaction. Unless otherwise provided herein, Fair Market Value shall be as determined unanimously by the Members; provided, that if the Members are unable to agree on the fair market value of such asset within a reasonable period of time, such fair market value shall be

LIMITED LIABILITY COMPANY AGREEMENT

determined by an investment banking, accounting, or valuation firm selected by unanimous agreement of the Members. The determination of such firm shall be final, conclusive, and binding and the fees and expenses of such valuation firm shall be borne equally by the Members.

16.40   "Fiscal Year" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to its taxable year.

16.41   "GAAP" has the meaning specified in Section 6.13.

16.42   "Governmental Authority" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations, or orders of such organization or authority have the force of law), or any arbitrator, court, or tribunal of competent jurisdiction.

16.43   "IEM" has the meaning specified in the preamble.

16.44   "IEM Manager" has the meaning specified in Section 6.2.

16.45   "Initial Capital Contribution" has the meaning specified in Section 2.1.

16.46   "Initiating Member" has the meaning specified in Section 9.3.

16.47   "Invention" means any idea, design, concept, process, technique, invention, discovery, or improvement, whether or not patentable, made by employees of one Member or jointly by employees of multiple Members in the conduct of the Business; provided that either the conception or reduction to practice occurs during the Term and in the conduct of the Business.

16.48   "Joint Inventions" has the meaning specified in Section 14.2.

16.49   "Law" means all applicable provisions of: (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations, or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with any Governmental Authority.

16.50   "Liquidator" has the meaning specified in Section 12.3.1.

16.51   "LLC Agreement" has the meaning specified in Section 3.2.2.

16.52   "Loss" has the meaning specified in Section 8.3.1.

16.53   "Manager" has the meaning specified in Section 6.1.

16.54   "Managers Schedule" has the meaning specified in Section 6.3.4.

16.55   "Mediation Procedures" has the meaning specified in Section 13.4.

16.56   "Member" means ABML, IEM, and each Person who is hereafter admitted as a Member in accordance with the terms hereof and the Act.

16.57   "Member Executive" has the meaning specified in Section 13.2.

16.58   "Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations § 1.704-2(i)(3). "Member Nonrecourse Deduction" means "partner nonrecourse deduction" as defined in Treasury Regulations § 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires.

BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

16.59 "Membership Interest" means an interest in the Company owned by a Member, including such Member's right to: (a) its distributive share of Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Company; (b) its distributive share of the assets of the Company; (c) vote on, consent to, or otherwise participate in any decision of the Members as provided herein; and (d) any and all other benefits to which such Member may be entitled as provided herein or the Act. The Membership Interest of each Member shall be expressed as a Percentage Interest.

16.60 "Net Income" and "Net Loss" mean, for each Fiscal Year or other period specified herein, an amount equal to the Company's taxable income or taxable loss, or items thereof, determined in accordance with Code § 703(a) (where, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code § 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments: (a) any income realized by the Company that is exempt from federal income taxation, as described in Code § 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income; (b) any expenditures of the Company described in Code § 705(a)(2)(B), including any items treated under Treasury Regulations § 1.704-1(b)(2)(iv)(I) as items described in Code § 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes; (c) any gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value; (d) any items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulations § 1.704-1(b)(2)(iv)(g); (e) if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss; and (f) to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code §§ 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulations § 1.704 1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

16.61 "Noncontributing Member" has the meaning specified in Section 2.2.2.

16.62 "Nonrecourse Deductions" has the meaning set forth in Treasury Regulations § 1.704-2(b). "Member Nonrecourse Debt" means "partner nonrecourse debt" as defined in Treasury Regulations § 1.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

16.63 "Nonrecourse Liability" has the meaning set forth in Treasury Regulations § 1.704-2(b)(3).

16.64 "Officer" has the meaning specified in Section 6.10.

16.65 "Percentage Interest" means, with respect to a Member at any time, the percentage reflective of the economic interest in the Company represented by such Member's Membership Interest; Percentage Interests shall always aggregate to 100%.

16.66 "Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

16.67 "Quarterly Estimated Tax Amount" of a Member for any calendar quarter of a Fiscal Year means the excess, if any, of: (a) the product of a quarter in the case of the first calendar quarter

                                                    BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

of the Fiscal Year, half in the case of the second calendar quarter of the Fiscal Year, three-quarters in the case of the third calendar quarter of the Fiscal Year, and one in the case of the fourth calendar quarter of the Fiscal Year and the Member's Estimated Tax Amount for such Fiscal Year; over (b) all distributions previously made during such Fiscal Year to such Member.

16.68 "Receiving Member" has the meaning specified in Section 10.2.

16.69 "Regulatory Allocations" has the meaning specified in Section 4.2.5.

16.70 "Related-party Agreement" means any agreement, arrangement, or understanding between the Company and any Member or Manager, any Affiliate of a Member or Manager, or any officer or employee thereof, including any sale, lease, transfer, or other disposition of any property or assets, any service agreement or arrangement, any employment or other agreement involving compensation, or any loan, advance, or guarantee to, with or for any of their benefit.

16.71 "Representative" means, with respect to any Person, all directors, managers, officers, employees, consultants, financial advisors, counsel, accountants, and other agents of such Person.

16.72 "Responding Member" has the meaning specified in Section 9.3.

16.73 "Restricted Period" has the meaning specified in Section 10.3.

16.74 "Revised Partnership Audit Rules" has the meaning specified in Section 11.4.3.

16.75 "Shortfall Amount" has the meaning specified in Section 5.2.2.

16.76 "Target" has the meaning specified in Section 10.4.

16.77 "Tax Amount" of a Member for a Fiscal Year means the product of the Tax Rate for such Fiscal Year and the Adjusted Taxable Income of the Member for such Fiscal Year with respect to its Membership Interest.

16.78 "Tax Distribution" has the meaning specified in Section 5.2.1.

16.79 "Tax Matters Representative" has the meaning specified in Section 11.4.1.

16.80 "Tax Rate" of a Member, for any period, means the highest effective marginal rate of combined federal, state, and local tax rate imposed for such period based on: (a) the highest general marginal rate of tax imposed on corporations under Code § 11(b) and the highest general combined marginal rate of state and city taxes imposed on corporations operating in the appropriate city and state; and (c) assuming the deductibility of state and city income taxes for federal income tax purposes.

16.81 "Taxing Authority" has the meaning specified in Section 5.3.2.

16.82 "Term" has the meaning specified in Section 1.7.

16.83 "Transfer" means to sell, transfer, assign, pledge, encumber, hypothecate, or similarly dispose of, by operation of law or otherwise, or to enter into any contract, option, or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation, or similar disposition of, any Membership Interest owned by a Person or any interest (including a beneficial interest or any direct or indirect economic or voting interest) in any Membership Interest owned by a Person; provided that none of an issuance, disposition, redemption, or repurchase of any interests in the ultimate parent entity of a Member will be deemed to be a Transfer of a Membership Interest, including by means of a disposition of interests in a Member or in a Person that holds any interests in a Member. "Transfer" when used as a noun shall have a correlative meaning. "Transferor" and "Transferee" mean a Person who makes or receives a Transfer, respectively.

                    BUSINESS CONFIDENTIAL

LIMITED LIABILITY COMPANY AGREEMENT

16.84   "Transferring Member" has the meaning specified in Section 9.2.

16.85   "Treasury Regulations" means the final or temporary regulations issued by the U.S. Department of Treasury pursuant to its authority under the Code, and any successor regulations.

16.86   "Withholding Advances" has the meaning specified in Section 5.3.2.

IN WITNESS WHEREOF, the Members have each caused this Agreement to be executed as of the date first written above by their authorized representatives.

ABML, INC.                                           INNOVATIVE EMERGENCY
                                                     MANAGEMENT, INC.

By: _Brittany Perkins Castillo_ _____      By: _Brad Tiffee_ _____
    Brittany Perkins Castillo                      Brad Tiffee
    President and Chief Executive Officer           Director of Operations

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

BUSINESS CONFIDENTIAL

# Exhibit B



| | | | |
| --- | --- | --- | --- |
| **James M. Wagstaffe**<br>PARTNER | 100 Pine Street, Suite 725<br>San Francisco, CA 94111 | wagstaffe@wvbrlaw.com<br>wvbrlaw.com | 415-357-8900 *Main*<br>415-357-8910 *Fax* |

May 5, 2021

**<u>VIA ELECTRONIC MAIL</u>**

ABML–IEM, LLC
Attn: Brittany P. Castillo
565 East Hillsboro Blvd
Deerfield Beach, FL 33441
brittany@ashbritt.com
Phone: 954.725.6992
Fax: 954.725.6991

ABML
Attn: Legal
565 East Hillsboro Blvd
Deerfield Beach, FL 33441
brittany@ashbritt.com
Phone: 954.725.6992
Fax: 954.725.6991

ABML–IEM, LLC
Attn: Brad Tiffee
2801 Slater Rd, Ste 200
Morrisville, NC 27560
legal@iem.com
Phone: 919.990.8191
Fax: 919.237.7468

Rogers Joseph O'Donnell PC
Attn: Neil H. O'Donnell
Robert Dollar Building
311 California St, 10 Fl
San Francisco, CA 94104
nodonnell@rjo.com
Phone: 415.956.2828
Fax: 415.956.6457

Re: <u>Follow-up to Informal Meeting of April 28, 2021</u>

Dear Ms. Castillo, et al.:

The purpose of this letter is to set forth Innovative Emergency Management, Inc. ("IEM")'s proposals and concerns regarding the views set forth by ABML at the recent joint meeting that occurred on April 28, 2021.  As my partner Frank Busch stated at the start of the meeting, IEM's goal was to determine whether ABML would approach governance issues related to ABML-IEM LLC ("the LLC") cooperatively.  Unfortunately, it was clear to me from the flat rejections of every IEM proposal, and refusal to offer any accommodation on any issue—whether structural or discrete—that was raised that ABML was not willing to do so in that forum.  Instead, ABML leadership repeatedly attempted to cut off discussion, with one representative going so far as to level personal attacks before leaving early after observing that merely discussing compromises was a waste of his time.

This, of course, is not the ***joint*** venture that IEM agreed to.  Nor is it a relationship that is likely to maximize the value of the LLC.  Before IEM decides what these two facts require

regarding new business, dissolution, and/or a push-pull termination of the two-manager relationship, this letter offers one last chance to correct course and begin acting in a way that will permit the LLC to continue its attempts to maximize its business.   Although there are several matters outstanding—including the NDA and publicity issues referenced on the call—there needs to be a resolution to the issue of banking controls before any of the other matters merit discussion.

Specifically, ABML has caused the LLC to establish accounts at ABML's preferred bank with ABML's regular banker and with no dual-signature requirement on any transaction of any size.  IEM has never consented to that structure, although it did provide Ms. Beriwal's personal information to the bank to assist in opening accounts it believed would be governed by routine financial controls.  While the parties have negotiated internal financial controls, ABML has refused any bank-level controls of any kind.   IEM is not willing to rely solely upon the negotiated internal financial controls as they relate to LLC accounts.  Instead, it proposes extremely limited bank-level controls as an added measure of security and good governance.  Specifically, IEM requests a bank-level dual signature requirement on individual disbursements in excess of $100,000.  IEM further requests that ABML commit to limiting the amount of disbursements that are not (1) pre-approved under the negotiated internal financial controls; (2) authorized by dual signature; and/or (3) reconciled and accepted by IEM to a maximum of $1 million.  IEM believes that these two additional controls are routine elements of good governance that will create little practical burden.

Moreover, these two limited controls do not run afoul of any of the concerns ABML expressed at the meeting, which were instead limited to routine transactions such as processing payroll and making other individual transactions that would generally be at least one order of magnitude below the dual-signature threshold proposed above.  By contrast, these controls will provide certainty to IEM that all major disbursements are appropriate, a matter of growing concern as ABML's objections appear both resistant to compromise and disjoint from its stated concerns.

Please let me know if ABML will agree to this compromise proposal.  In my opinion, it does not require modification of the LLC Agreement to implement, as that agreement already contemplates multiple officers having a role in banking.

Nor does the LLC Agreement require modification to ensure that further non-operational decisions are made jointly, rather than by fiat.  Nor is modification required to ensure that disputes are resolved in the orderly manner set forth in Article 13, rather than by ultimatum and ABML-controlled vote.[1]  To the extent ABML disagrees, the proper solution is to modify the LLC Agreement to clarify those rights, and ensure that structural decisions—like other decisions

---

[1] The reason for the LLC Agreement to expressly strip the Chairperson of the right to end discussion of a disputed item, as set forth in Section 6.9, can only be to permit Article 13 dispute resolution in appropriate cases.

to bind the LLC—require unanimous consent.  Or, at least, that disputes are resolved before voting.

   If, as I fear based upon the blunt and inflammatory positions taken by ABML on April 28, the only path to cooperation would require litigation, and ABML asserts total control over the LLC, ABML's conduct in that asserted capacity is subject to Florida's strict fiduciary duty protections.  It goes without saying that those who control an entity owe fiduciary duties to other members.  *See, e.g., Tills v. United Parts*, 395 So. 2d 618, 619 (Fla. Dist. Ct. App. 1981). Where, as here, the controlling fiduciary is an entity, liability reaches the entity-fiduciary's human managers.  *Feeley v. NHAOCG, Ltd. Liab. Co*., 62 A.3d 649, 671 (Del. Ch. 2012). Moreover, while the LLC Agreement purports to waive fiduciary obligations, such waiver is barred by Section 605.0105 of Florida's LLC Act.  *E.g. McCoy v. Durden*, 155 So. 3d 399, 407 (Fla. Dist. Ct. App. 2014) (reversing summary judgment where waiver was barred by LLC Act).

   It would seem far preferable to me for the LLC to operate cooperatively at full capacity than to operate in a limited short-term capacity with ABML claiming to be a controlling member. It is therefore my hope that this last effort succeeds at obtaining cooperation on the banking matters addressed above.

Very truly yours,

James M. Wagstaffe

# Exhibit C



**W | V | B | R**

Wagstaffe, von Loewenfeldt,
Busch & Radwick LLP

---

**James M. Wagstaffe**
PARTNER

100 Pine Street, Suite 725
San Francisco, CA 94111

wagstaffe@wvbrlaw.com
wvbrlaw.com

415-357-8900  *Main*
415-357-8910  *Fax*

---

May 13, 2021

**<u>VIA ELECTRONIC MAIL</u>**

Michael W. Moskowitz
Moskowitz, Mandell, Salim
& Simowitz, P.A.
800 Corporate Drive, Ste. 500
Ft. Lauderdale, FL 33334
<u>mmoskowitz@MMSSLaw.com</u>
(954) 776-9211

Re: <u>Dual Signature Financial Control</u>

Dear Michael:

The purpose of this letter is to respond to your letter of May 11, 2021.

First, to correct the record, the email exchange you provided shows that ABML emailed a list at 9:58 a.m. of checks that "will be cut" unless the sole IEM recipient raised questions by 11. ABML thus offered IEM only 62 minutes to consider the checks to avoid unilateral disbursement. That is not consistent with the internal protocol IEM agreed to, even though in this specific case Dan Michael was able to review and sign off in two hours and 12 minutes, and ABML agreed to modify its initial demand to permit that time. ABML's statement that this process will continue going forward—and that it complies with the agreement to avoid distributions without both parties' consent—is troubling and not consistent with any agreement from IEM.

Second, your letter mischaracterizes my partner's objection. He did not "disavow as unknown to IEM" the disbursements made last week. Instead, he described exactly what the email attached to your letter showed: ABML unilaterally deciding to make payments with only a 62-minute notice provided to one IEM employee. That is not a process consistent with any agreement between the parties as it could easily have resulted in unreviewed payments going out if, for example, Mr. Michael had had an hour-long meeting at 10. What ABML should have done is submit the list of checks it believed were appropriate and requested Mr. Michael's affirmative consent. If that consent was needed by a specific time for a specific reason, IEM

should have provided that explanation and sufficient advance notice.  There should never have been a risk that checks would be paid without express consent.

Third, your letter persists in mischaracterizing IEM's past agreements.  IEM has never agreed that even a compliant internal control obviates the need for a bank-level dual signature requirement on items in excess of $100,000.  Not only has IEM not done so, ABML has never expressed any explanation for why it refuses that control, instead relying only on issues that have nothing to do with payments of that size, such as practical complications with payroll processing.  This exchange further highlights the need for that control, particularly as it now appears to be ABML's official position—conveyed through counsel in a considered letter—that it has a unilateral right to make any disbursement it wants unilaterally so long as it provides an hour of advance notice.  IEM has never, and does not, waver from its demand for this routine protection against large unilateral disbursements.

I would hope that, consistent with ABML's fiduciary duties as explained in prior correspondence, it will commit to affirmative internal consent coupled with an overarching dual signature protection on large disbursements.

Very truly yours,

James M. Wagstaffe

# Exhibit D

LAW OFFICES

# MOSKOWITZ, MANDELL, SALIM & SIMOWITZ, P.A.

800 CORPORATE DRIVE • SUITE 500
FORT LAUDERDALE, FLORIDA 33334

MICHAEL W. MOSKOWITZ*[1]
SCOTT E. SIMOWITZ[1]
CRAIG J. MANDELL
WILLIAM G. SALIM, JR.**
SCOTT M. ZASLAV*
ARI J. GLAZER^
TODD A. ARMBRUSTER
ARTHUR E. LEWIS

_____

ALSO ADMITTED IN NY & DC*
ALSO ADMITTED IN MA**
ALSO ADMITTED IN NY & CT°
ALSO ADMITTED IN NY^

CERTIFIED CIRCUIT COURT MEDIATOR[1]

BROWARD (954) 491-2000
TELECOPIER (954) 491-2051

_____

OF COUNSEL

SHIRLEY D. WEISMAN, P.A.

Michael W. Moskowitz
mmoskowitz@mmsslaw.com
Direct (954) 776-9211

May 11, 2021

**VIA E-MAIL**

Frank Busch, Esq.
Wagstaffe, von Loewenfeldt, Busch & Radwick, LLP
100 Pine Street, Suite 725
San Francisco, CA 94111

Re:     ABLM-IEM, LLC

Dear Mr. Busch:

In response to your email dated May 9, 2021, I write to correct your misconception of the process and misstatement as to IEM's alleged lack of prior approval of the disbursements made by ABML. No payments of LLC funds have been made by ABML without the express approval of IEM. The specific disbursements that you disavow as unknown to IEM were indeed approved after review with IEM. As evidenced by the email string attached, Dan Michael not only saw the proposed disbursements prior, but provided his written authorization on May 7, 2021, prior to disbursement. Thus, the agreed upon controls and process were followed, and obviously work. They will continue to be followed throughout the course of the venture.

Very truly yours,

MOSKOWITZ, MANDELL, SALIM & SIMOWITZ, P.A.

BY:   _/s/ Michael W. Moskowitz_____
            MICHAEL W. MOSKOWITZ

cc: Client (via email)
      Neil O'Donnell, Esq. (via email)
      James Wagstaffe, Esq. (via email)

# Exhibit E



Wagstaffe, von Loewenfeldt,
Busch & Radwick LLP

| **James M. Wagstaffe**<br>PARTNER | 100 Pine Street, Suite 2250<br>San Francisco, CA 94111 | wagstaffe@wvbrlaw.com<br>wvbrlaw.com | 415-357-8900  *Main*<br>415-357-8910  *Fax* |

November 8, 2022

**VIA ELECTRONIC MAIL**

Rogers Joseph O'Donnell PC
Attn: Neil H. O'Donnell
Robert Dollar Building
311 California St, 10 Fl
San Francisco, CA 94104
nodonnell@rjo.com
Phone: 415.956.2828
Fax: 415.956.6457

| ABML–IEM, LLC | ABML |
| Attn: Brittany P. Castillo | Attn: Legal |
| 565 East Hillsboro Blvd | 565 East Hillsboro Blvd |
| Deerfield Beach, FL, 33441 | Deerfield Beach, FL, 33441 |
| brittany@ashbritt.com | brittany@ashbritt.com |
| Phone: 954.725.6992 | Phone: 954.725.6992 |
| Fax: 954.725.6991 | Fax: 954.725.6991 |

Re: ABML's Unilateral Distribution of over $29 million

Dear All:

As you will likely recall, WVBR was initially retained by IEM to express concerns regarding ABML's demand to have operational control of ABML–IEM, LLC ("the LLC"), including with respect to its banking. As we warned you at the time, those who control an entity owe fiduciary duties to other members. *See, e.g., Tills v. United Parts*, 395 So. 2d 618, 619 (Fla. Dist. Ct. App. 1981). Where, as here, the controlling fiduciary is an entity, liability reaches the entity-fiduciary's human managers. *Feeley v. NHAOCG, Ltd. Liab. Co*., 62 A.3d 649, 671 (Del. Ch. 2012). Moreover, while the LLC Agreement purports to waive fiduciary obligations, such waiver is barred by Section 605.0105 of Florida's LLC Act. *E.g. McCoy v. Durden*, 155 So. 3d 399, 407 (Fla. Dist. Ct. App. 2014) (reversing summary judgment where waiver was barred by LLC Act). Based upon ABML's commitment not to abuse its unilateral authority, and adhere to the LLC Agreement, IEM ultimately acceded to ABML's demand to control the LLC's finances.

### *ABML has improperly taken $29 million in violation of the LLC Agreement*

I am informed that ABML has engaged in the very breaches of the LLC Agreement—and its fiduciary duty—that initially motivated IEM's concerns and my firm's retention. Specifically, I understand that ABML recently distributed $29,225,845.88 to itself without sending IEM a penny (the "Unilateral Distribution").

There can be no question that the Unilateral Distribution violates the LLC Agreement. Section 5.1.1 could not be clearer that "Any available cash of the Company. . . shall be distributed to the Members, on at least an annual basis, *pro rata* in accordance with their Percentage Interests." (emphasis added). $29 million to ABML and $0 to IEM is not a pro rata distribution. There can also be no claim that ABML was entitled to the money, as the LLC Agreement makes clear that no one owns LLC assets before distribution. *See, e.g.,* LLC Agreement §§ 2.6, 3.5. Thus, IEM will certainly prevail on any claim regarding ABML's illegal conduct.

### *Demand to mitigate harms*

Given the large scale of ABML's misconduct, IEM has suffered significant harm. In an effort to mitigate this harm, IEM demands that ABML belatedly comply with Section 5.1.1 and distribute $29,225,845.88 in the same fashion that AMBL has managed prior distributions to IEM. This distribution must be made *within twenty-four hours* of this letter.

For the avoidance of doubt, IEM reserves all rights regarding damages that would not be mitigated by ABML's belated compliance.

### *Notice of Dispute*

In view of the egregious, intentional, and large-scale conduct in which ABML has engaged, please consider this letter to be a notice of dispute within the meaning of the LLC Agreement.

If, and only if, ABML accedes to the mitigation demand above, IEM is willing to defer further action until a mediation can be had regarding any remaining consequences of ABML's conduct. Absent timely compliance, IEM will have no choice but to exercise its rights under Section 13.7 to obtain emergency relief and/or specific performance to avoid the irreparable harm caused by ABML's conduct.

\*             \*             \*

//
//
//

Brittany P. Castillo
November 8, 2022
Page 3

       IEM appreciates your anticipated prompt attention to this matter.  Assuming ABML will promptly wire the requested funds, please let me know when the wire is placed so that IEM may confirm receipt.

Very truly yours,

James M. Wagstaffe

# Exhibit F

415.956.2828 (t)   Robert Dollar Building
415.956.6457 (f)   311 California Street, 10th Flr.
                   San Francisco CA  94104

202.777.8950 (t)   1500 K Street, NW, Suite 800
202.347.8429 (f)   Washington DC  20005
www.rjo.com

# ROGERS JOSEPH O'DONNELL

November 9, 2022

**Via E-mail (wagstaffe@wvbrlaw.com)**

James M. Wagstaffe
WVBR LLP
100 Pine Street, Suite 725
San Francisco, CA 94111

Re:   ABML-IEM, LLC

Dear Mr. Wagstaffe:

ABML has received your letter of November 8, 2022and asked me to respond.

ABML has not engaged in any breach of its obligations under either the specific provisions of ABML-IEM LLC Agreement or under any fiduciary obligations that it might have in connection with that Agreement.  Rather it is IEM, not ABML, that has violated fundamental obligations under the Agreement.  As described in the second recital of the LLC agreement, ABML-IEM was formed to carry out the business of COVID-19 healthcare support operations throughout the United States.  Section 6.12.2  of the Agreement provided that neither IEM nor ABML would unilaterally perform business that was in LLC's scope of business without first offering it to the LLC and obtaining the consent of the LLC for such unilateral performance.  Section 10.3.1 further prohibited either Member of the LLC from competing with the LLC in the business for which the LLC was performed either itself or through its affiliates.

Despite these clear provisions, IEM has admitted that it performed work within the scope of the LLC's business unilaterally and without first offering the LLC the opportunity to perform that work.  As early as May 2021, after being confronted by ABML, Mr. Bryan Koons identified some such work by IEM in both Louisiana and Illinois.  ABML has repeatedly demanded a full accounting of that work given that the LLC, not IEM alone, is entitled to the financial benefit of that work.  ABML has also requested identification of any other such unilateral IEM work given indications that IEM continued this improper practice beyond the admitted instances in Louisiana and Illinois.  See e.g. my letters to you of May 27, 2021, and June 10, 2021.  ABML has not provided any such accountings for previously admitted work or response either identifying or denying any additional improper unilateral work.

A Professional Law Corporation    A Professional Law Corporation

ROGERS JOSEPH O'DONNELL

James M. Wagstaffe
November 9, 2022
Page 2

Recently, given that the work of the LLC is winding down, ABML has attempted to reach an agreement to resolve issues between the two Members of the LLC, including the amount of distributions owed to each and the question of the amount and effect of IEM's unauthorized unilateral work.  To accomplish those purposes ABML did two things.

- First, it prepared and distributed a draft amendment to the LLC Agreement providing for the winddown of the business, except for standby warehouses, and specifically requiring, in paragraph 8, an identification of any violation of Section 6.12.2 of the LLC Agreement and a financial accounting for any such improper unilateral work.  Ms. Castillo, AshBritt's CEO, provided a copy of that amendment to Ray Mueller and Brian Koon, IEM's LLC Board Members, on September 26, 2022.  Although Ms. Castillo asked Mr. Mueller and Mr. Koon to review the amendment and provide any requested modifications, the only response that ABML has received to date is a simple acknowledgement from Mr. Mueller that he has received the document.

- Second, the CFOs of the two Members worked on questions concerning allocation of expenses to the LLC as opposed to the individual members and reached an understanding on the total to distribute and each party's share.  The email of Rhysie Nance of ABML to Dan Patrick of IEM on September 30, 2022, showed a total distribution amount of $58,451,691.76 and a pro rata amount for each party of $29,225,845.88.

At that point the amount owed to ABML was clear as no issues remained to be resolved for its distribution.  ABML, therefore, made the distribution of its pro rata share. IEM, however, has not responded to the repeated demand for identification of the total amount and the financial effect of business within the scope of the LLC that it performed on its own without first offering the opportunity to the LLC. The extent to which its distribution will be reduced to account for this highly improper activity remains to be determined.

ABML strongly disagrees with your allegation that its distribution of its pro rata share in these circumstances is contrary to the terms of the LLC Agreement, let alone a violation of any fiduciary obligation.  IEM has repeatedly refused to account for its highly improper usurping of business that belongs to the LLC, thus leaving in question the total amount that will ultimately be owed to it.  The requirement of the LLC Agreement is that the

A Professional Law Corporation

ROGERS JOSEPH O'DONNELL

www.rjo.com

James M. Wagstaffe
November 9, 2022
Page 3

Net Income and Net Loss of the Company be allocated "each Fiscal Year" (Section 4.1) and distributed "on at least an annual basis. "(Section 5.1.1) ABML is fully prepared to comply with those provisions, including their timing requirements.  As soon as IEM provides an accounting of the value of the work that it improperly took for itself, IEM will work to reach an agreement as to the effect on the distribution owed to IEM.  If IEM persists in refusing to provide such an accounting, or the parties are unable to agree on its effect, by the end of the fiscal year, Ashbritt will make a unilateral determination of the proper offset amount based on the best information available, subject to the disputes provision of the Agreement.  In any case, ABML will make IEM's distribution within the fiscal year.  In the meantime, it will maintain in the account an amount equal to its distribution plus the additional amounts on which the parties have agreed as reserve.  In these circumstances, IEM has no reasonable concern that it will receive all funds properly owed to it.

IEM cannot reasonably preclude ABML's access to its distribution by refusing to provide the information about IEM's blatant violation of its contractual obligations that would be permit a final determination of the necessary adjustments to its share.  The LLC Agreement contains no stated requirement for simultaneous distribution and one that would require such an inequitable result cannot reasonably be implied.

If IEM will provide a full accounting of its improper unilateral work, including the profitability obtained as a result, this matter should be able to be resolved quickly. ABML urges IEM to do so.

Very truly yours,

Neil H. O'Donnell

555675.1

A Professional Law Corporation